*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PEGGY DOWNING, | ) | |
| | ) | Supreme Court No. S-18100 |
| Appellant, | ) | |
| | ) | Superior Court No. 3PA-18-01949 CI |
| v. | ) | |
| | ) | |
| SHORESIDE PETROLEUM, INC. | ) | O P I N I O N |
| and RUSSELL MILLS, | ) | |
| | ) | No. 7651 – May 5, 2023 |
| Appellees. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Kari Kristiansen, Judge.

Appearances: William D. Cook, Law Offices of William Dennie Cook, Eagle River, and Griffith J. Winthrop, III, Orlando, Florida, for Appellant. Matthew T. Findley and Benjamin J. Farkash, Ashburn & Mason, P.C., Anchorage, for Appellees.

Before: Winfree, Chief Justice, Maassen, Carney, Borghesan, and Henderson, Justices.

CARNEY, Justice.

# I.    INTRODUCTION

A tractor-trailer truck rear-ended a stopped car at a construction site, injuring the driver of the car. The injured driver was a successful surgeon, who suffered permanent injuries that limited her ability to practice medicine. She sued the truck driver

and his employer for damages, including medical expenses, pain and suffering, lost earnings, and lost future earning capacity. After a bench trial, the superior court awarded damages for all categories except lost future earning capacity. Even though the court found that the surgeon had proven her injuries permanently impaired her future earning capacity, the court concluded that the surgeon had failed to prove the amount of her future lost earning capacity with reasonable certainty. The court reconsidered the defendants' motion to dismiss several categories of damages, which it had previously denied, and dismissed the claim for lost future earning capacity. The court then found neither party was a prevailing party and ordered each side to be responsible for its own fees and costs.

The surgeon appeals. She argues that the superior court erred by requiring her to prove the amount of her future lost earnings to a "reasonable certainty." She also argues that the court erred by not finding she was the prevailing party for purposes of attorney's fees. We conclude it was legal error to require proof of the amount of lost future earnings to a reasonable certainty and not to award at least nominal damages to the surgeon for the proven harm to her future earning capacity from her injuries. We therefore reverse the dismissal of the lost earning capacity claim and remand for calculation of damages based on the appropriate standard of proof. As a result, we vacate the award of attorney's fees pending the court's determination on remand.

II.     FACTS AND PROCEEDINGS

A.     The Accident

In June 2017, 60-year-old Peggy Downing stopped her car at a construction site and was rear-ended by a tractor-trailer driven by an employee of Shoreside Petroleum, Inc. The impact crushed the back of the car, pushed it into the vehicle in front of it, and left Downing unconscious for some time. Downing's injuries included "a laceration on her head, severe bruising throughout her body, and five broken ribs."

Downing also suffered dizziness, headaches, pain, memory loss, and sensory disturbances that continued after the crash. Some of her symptoms persisted through the time of trial three and a half years later.

Downing is an obstetrician-gynecologist (OB/GYN) and the sole proprietor of Generations Medical Center. The medical center provides primary and specialized care and employs several physicians and assistants. Until late 2019 Downing had admission and surgical privileges at four hospitals and medical centers, including Mat-Su Regional Medical Center, where she delivered babies, including complex deliveries, and performed robotic surgeries. These hospital-based procedures were a significant source of Generations' revenue.

Soon after the accident Downing saw a neurologist, Dr. Scot Hines, because of her ongoing symptoms. Dr. Hines advised her to limit herself to "light duty" and routine surgery when she returned to work in late June. In November, without examining Downing again, Dr. Hines released her to work "without restrictions." Downing began gradually increasing her hours in September, but because her symptoms continued she was unable to resume her full schedule.

After a second neurologist expressed concern about her ability to resume full-time duties, Downing informed Mat-Su Regional about her continuing impairment in August 2019. Because Mat-Su Regional advised her that it intended to begin a formal investigation into her competence, which could lead to an entry on the National Practitioner Data Bank,[1] Downing chose to relinquish her surgical and admission

---

[1]     Established by Congress in 1986 to "prevent[] practitioners from moving state to state without disclosure or discovery of previous damaging performance," the National Practitioner Data Bank contains reports on medical malpractice payments and adverse actions related to health care practitioners, providers, and suppliers. NATIONAL PRACTITIONER DATA BANK, *About Us*, https://www.npdb.hrsa.gov/topNavigation/about
(continued...)

privileges there. Downing also stopped performing on-call duties.

In July 2018 Downing sued Shoreside and its employee (collectively "Shoreside"). Shoreside admitted liability for the accident, but contested the cause, severity, and amount of Downing's claimed damages.

## B. Proceedings

The superior court held a ten-day bench trial in January 2021. Downing presented nine expert witnesses about various aspects of her injuries, symptoms, and care. Downing also called her daughter, who worked at Generations, Generations' tax preparer, and a vocational expert who testified about the economic impact of Downing's injuries on her practice. Finally Downing testified herself. Depositions were admitted in evidence from some of the same experts, a witness to the accident, and three other Generations employees. We summarize only the testimony relevant to Downing's entitlement to damages for lost future earning capacity.

### 1. Downing's case

#### a. Medical expert witness testimony

Downing presented nine expert witnesses about the accident's effects on her. Three medical specialists — a neuropsychologist, a neuroradiologist, and a neuroscientist — testified that Downing had suffered a traumatic brain injury (TBI) due to the accident and that her resulting impairments were likely permanent. Six of Downing's experts testified about the TBI's effects on her verbal expression, memory, spelling, reading and auditory comprehension, and fatigue.

The neuropsychologist expressed concern about the TBI's impact on Downing's ability to perform complex surgeries. A speech language pathologist and an

---

[1] (...continued)
Us.jsp (last visited Mar. 20, 2023).

audiologist (who was also a speech language pathologist) both stated that sensory processing issues from the TBI impaired her ability to work. The audiologist testified that because of her auditory comprehension difficulties, "chaotic and noisy" delivery rooms would require Downing to "work harder to hear what is said to her" and cause her to tire quickly. A neuro-optometrist noted that visual impairments could affect her surgical abilities. The neuroscientist concluded that Downing's injuries from the accident had caused "a constellation of problems . . . that limit her work ability." He concluded that Downing was significantly impaired as a result of the TBI she suffered and would likely experience more rapid cognitive decline as she aged compared to someone without a TBI. The neuroscientist testified that Downing should not be performing surgeries or taking on-call duties and that he had encouraged Downing to inform the hospital and her medical malpractice insurance carrier about her symptoms for safety reasons.

A neurosurgeon testified that the accident aggravated preexisting problems in Downing's neck and spinal cord, causing pain, tingling, and numbness in her upper body that improved only with rest and would eventually require surgery. He testified that her injuries "substantially and permanently limit[ed]" Downing's ability to "perform[] manual tasks, walk[], and work[]."

### b. Generations staff testimony

Downing relied on Generations staff to establish the change in her work habits before and after the accident. Her daughter and the Generations office manager both described Downing as working grueling hours before the accident, both in her medical practice, which included nighttime and on call duties, and running the clinic's business. Downing's daughter testified that before the accident her mother planned to work for at least 10 more years.

Downing's daughter and the office manager also described the changes they

had observed since the accident. Each of them recounted Downing's difficulty concentrating or staying organized and noted that as a result, Downing was easily frustrated and often irritable. Her daughter and the accountant stated that Downing's ongoing pain and other symptoms prevented her from resuming her previous busy schedule. Downing's daughter testified that her mother was unsure how much longer she could continue to work. The office manager explained that Downing's reduced capacity had resulted in decreased revenue for Generations and led the clinic to make cuts, including not replacing staff.

Dr. Donna Chester, who had been hired to fill the gap in services created by Downing's impairments, stated she was hired in June 2020 and became Generations' sole robotic surgeon. Dr. Chester explained the impact of performing surgeries on the clinic's revenue, comparing a "plain GYN with no procedures" who would earn about $150,000 to $200,000 per year with her own income. Because she could perform deliveries and surgeries, Generations paid her $300,000 for nine months of work, plus about $20,000 to $50,000 in bonuses and benefits. Dr. Chester also observed that an OB/GYN could earn even more through networking and referrals.

Downing testified that before the accident she had a "near photographic memory," excelled in school, scored in the 96th percentile on a national medical school admission test without taking a practice course, and graduated fourth in her medical school class. She testified that before the accident she was also responsible for business planning, generating new clientele, and overseeing employees. She testified that after the accident other employees had to take over some of those duties, the clinic had to hire an additional person, and she was not able to be as involved in business decision-making. And she testified that Generations had to change its previous plans to hire younger doctors to take over the clinic after she retired, because she could not provide them the expected training and information about the clinic's business and patients.

Downing also described how her injuries affected her ability to work her earlier rigorous schedule. She testified that she had been able to work only about 5% of her previous schedule during the summer after the accident, only about 30-40% of her previous capacity after Dr. Hines told her she was "unrestricted" to return to work, and did not resume on-call duties until September 2017.

Downing testified that she "struggle[d]" to return to a full schedule because of continuing headaches, dizziness, fatigue, and irritability, as well as difficulties concentrating and multitasking, and other issues such as trouble with spelling. Downing described how post-accident memory issues affected not only patient care but also her relations with patients, since remembering patient details was an important way to build rapport during office visits.

Downing acknowledged that she had been reluctant to give up hospital privileges because she did not think her impairments affected her ability, but she came to recognize there were safety reasons to give up her surgical privileges. Downing stated that even a mild neurocognitive disorder and dizziness could pose problems in the operating room, that fatigue was a "number one . . . cause of medical errors," and that irritability was a common concern in the medical field.

c.      Economic impact testimony

Downing testified that losing hospital admission and surgical privileges to perform robotic surgeries and complex deliveries had a "significant impact" on her ability to earn income. She testified that she had to hire Dr. Chester to perform robotic surgeries, which were the most profitable procedures Downing had previously performed. Downing testified that, because she no longer had hospital admission privileges, she also needed another OB/GYN to help with deliveries in case hospitalization was required. She testified she was able to perform simple outpatient surgery, but her highest-earning procedure billed at $5,000 less than more complex ones

before the accident. Downing testified she no longer took on-call shifts because she had "cognitively . . . gotten a lot better" after stopping them and getting more rest.

Downing described other impacts the accident had on her income, including the loss of referral sources. For example, she testified that because of her reduced hours she could not establish contact with new obstetrical patients when they come in early in their pregnancies, which meant she would not have them as patients during their delivery seven to eight months later. Downing stated that Generations was not making enough income to cover its bills in 2020, and believed that, due to the billing lag for medical services, this reflected the effect of her loss of surgical and admission privileges in 2019.

Downing contended that the financial impact of her initial inability to work after the accident extended for longer than what was reflected in records of missed appointments, taking into account the lag in billing cycle. She testified that overall she was working fewer hours and at a slower pace. She also testified that she had planned to continue to practice medicine until the end of the clinic lease, about eight and a half years from trial, but after the accident she believed it would be difficult to do that. Downing also testified she sought to sell the practice, but the buyer had backed out once Downing lost her hospital privileges because the practice would not be able to generate the same revenue, which would make it harder to cover overhead costs.

Generations' accountant testified that Downing's earning capacity was reflected in the business income reported on Schedule C of her tax returns. He explained that because Generations was a pass-through entity, Downing as sole proprietor was personally taxed on the business's entire income, regardless of any personal draws she took. The accountant stated that as a result, Downing's personal draws from the business's income did not reflect her earning capacity.

### d. Expert testimony about Downing's income and earning capacity

Downing called Enrique Vega, a vocational rehabilitation counselor and disability management specialist, as an expert about loss of future earning capacity. Vega also testified to Downing's past loss of income and calculated that Downing lost a total of $3,838,935 in earnings from the accident to the trial date. Vega calculated that the accident had reduced her earning capacity from $1,237,888 per year to $100,000 per year.

Vega explained how he reached his result. He testified he first determined that Downing had an occupational disability — a condition that would cause her to work and earn less than a non-disabled counterpart — and then determined the present value of the difference between her pre- and post-accident earning capacity and work life expectancy. He testified that Downing had a "cognitive disability," which the Census Bureau defined as "serious difficulty remembering, concentrating, [and] making decisions as a result of a physical[,] cognitive[,] or emotional medical impairment." Vega concluded that the disability had affected Downing's ability to work because of its impact on her medical and scheduling capacities which was proven by the reduction in her income following the accident and again after the loss of her hospital privileges.

Vega testified that he determined Downing's pre-accident earning capacity based on her net income from Generations as reported on the Schedule Cs. He explained that the Schedule C information reflected Downing's earning capacity: subtracting costs from revenues revealed her earning capacity better than her service billing alone because she worked as a physician as well as a manager and employer. Vega calculated Downing's earning capacity before the accident was $1,237,888 at the time of trial by averaging her tax returns for 2015 and 2016 and adjusting to 2020 dollars. Vega stated he purposely chose Generations' most profitable years to reflect the highest range of

Downing's earning capacity. He stated that "back to back" earnings over $1 million in 2015 and 2016 demonstrated Downing's proven earning capacity. Vega explained that it was appropriate to consider the most recent income peak, rather than a long-term average over several prior years, because it reflected the higher end of what someone could earn (*i.e.*, the individual's *capacity*) as well as the "age earning curve" that typically results from earning more as one ages due to higher training, skills, and experience. Vega testified that he made conservative estimates of Downing's future earning capacity by "imputing minimal growth" to her income after 2016 and freezing her expected future income at estimated 2020 levels. In response to the superior court's skepticism about relying only on high-earning years to calculate Downing's earning capacity, Vega explained that high-earning years — especially in sequence — were good indicators of earning capacity, but he also averaged Downing's Schedule Cs for the ten years preceding the accident. Using that method Vega arrived at a more conservative estimate of Downing's pre-accident earning capacity of under $670,000.

Vega testified that he calculated Downing's earning capacity after the accident at $100,000. Vega testified Downing's future earning capacity would not be zero because she could "adjust her practice" to ensure some continued income from her own labor. He stated that $100,000 was between the average salary for females in Alaska with a doctorate degree and a mild cognitive disability ($90,000) and the average salary for OB/GYNs in Alaska with hospital privileges ($280,000): it also reflected Downing's belief that her post-injury earning capacity was approximately $100,000.

Vega also explained his work life expectancy calculations. He testified that Downing's work life expectancy before the accident would have been eight and a half years from the date of trial. He based the figure on the Generations lease's expiration date, but acknowledged that statistically the remaining work life expectancy for a woman Downing's age was 6.3 years and a man's was 7.3 years. Vega noted that Downing's

profile was more like a male in terms of work life expectancy because factors that generally lower female work life expectancy, like anticipating child bearing and child rearing in the future, no longer applied to Downing. He testified that Downing's post-accident statistical work life expectancy would be 4.1 years. Using his initial calculation of Downing's pre-accident earning capacity of $1.2 million, he estimated her future lost earning capacity for each possible work life expectancy range, arriving at $7.3 million for female, $8.6 million for male, and $10.1 million for the assumed life expectancy based on her lease. Vega believed that the life expectancy based on the clinic lease was the most likely scenario given evidence that Downing had intended to work at least until the end of the lease, the lease contained a half-million dollar penalty for early termination, and medical professionals tend to "work until they drop."

On cross-examination Vega explained that he did not take into account the pandemic's potential impact on Downing's business because he did not believe it was significant to understanding changes in her long-term earning capacity. And unlike many other professions that were hurt by the pandemic, medical services had been "overwhelmed" and OB/GYN services were likely less affected.

**2.      Shoreside's case**

Shoreside called four medical expert witnesses about the extent and severity of Downing's injuries and offered the deposition of Dr. Hines, the neurologist who had cleared Downing to return to work in November 2017 without reexamining her. Shoreside also called the chair of Mat-Su Regional's provider wellness committee, and presented a forensic certified public accountant as an expert witness to counter Vega's testimony.

Dr. Hines stated that Downing had reported fewer symptoms to him. A neuroradiologist questioned whether the imaging of Downing's brain definitively indicated injury. Shoreside's neuropsychologist agreed with Downing's expert about her

mild TBI and her test results, but disagreed that they indicated significant impairments or resulted from the accident. A neuro-ophthalmologist questioned the methodology Downing's expert used to assess her visual impairments and was "hesitant to conclude" Downing's visual issues would affect her surgical abilities. Shoreside also called an orthopedic surgeon who acknowledged that the impact from the collision was above the threshold for causing bodily injury and that Downing's symptoms appeared after the accident, but questioned whether they were related directly to the collision. He testified he did not believe Downing's ability to perform surgeries was affected.

Shoreside called the past president of Mat-Su Regional's medical staff to testify about Downing's decision to relinquish her surgical privileges. She explained that Downing was given the option of voluntarily relinquishing her privileges or undergoing a formal process for further evaluation. She explained that if an evaluation determined Downing was not competent, Downing would be reported to the public National Practitioner Data Bank, which could limit her future practice. Given Downing's professed concerns about her health and abilities, she believed Downing's decision to report her medical issues to the wellness committee was "appropriate."

Shoreside called Debora Mason, a certified public accountant, as an expert witness about the amount of Downing's damages. In contrast to Vega's testimony about future earning capacity, Mason explained she had reviewed information "related to a potential loss of [Generations'] business income claim" to determine only whether the accident had caused business losses. She clarified that she had formed no opinion about categories of damages such as Downing's medical expenses, lost earning capacity, decreased personal income, or Generations' finances after Downing surrendered her surgical privileges.

Mason challenged Vega's "before and after" method for calculating lost business income resulting from the accident. She asserted that Generations' business

income had fluctuated through the years, indicating that it was affected by factors unrelated to the accident, such as changes in Medicaid rates and a clinic move, and that comparing profits before and after did not lead to a valid figure. Mason compared the difference in expected business profits due to the various factors she identified and Generations' actual profits, concluding that Generations' income would have declined even if the accident had not occurred.

Mason calculated the loss of business income attributable to the accident in two ways. First she analyzed the net charges attributed from each provider at Generations on a quarterly basis. She asserted her method was more accurate than using Downing's annual income on the Schedule C of her 2017 tax return to determine whether decreases in Downing's charges were a direct result of the accident rather than general factors affecting all providers. Mason chose the second quarter of 2017 (March, April, May) as a "base" to compare fluctuations in charges following the accident. She determined that net charges for all providers in the quarter following the accident increased by 15.9% and Downing's charges decreased by 1.5%. In the next quarter all the providers' net charges decreased by 36% from the base quarter, but Downing's decreased only by 25.1%, leading Mason to conclude that Downing "show[ed] no evidence of . . . ongoing loss." Mason acknowledged that the decrease in other providers' charges during the second quarter could be attributed to one provider taking maternity leave. Mason concluded this method yielded only a $32,137 loss in business income attributable to the accident in 2017.

Mason's second method calculated the loss by multiplying Downing's average net charges as a percentage of the total for Generations (31%) by Generations' total net charges in the second two quarters of 2017 by the same percentage. This yielded a loss of $79,961 for June, July, August, and September 2017 attributable to the accident. Mason concluded that business income in October and November "exceeded

the expected charges, thus indicating no evidence of further loss." Mason offered the second amount as her ultimate opinion on Downing's lost earnings.

On cross-examination Mason testified that based on the financial documents provided in discovery, Generations received $1.16 million from Downing's gross receipts in 2016, $617,677 in 2017, $1.27 million in 2018, and $880,427 in 2019. Mason also calculated Downing's net provider charges at $1.1 million in 2016, $1.04 million in 2018, and $867,000 in 2019. Her report showed Downing's 2017 net provider charges as $668,393. Mason acknowledged the decreases in 2017 and 2019 could be explained by the accident, followed by Downing's loss of surgical privileges. But when asked whether those totals before and after the accident reflected Downing's "loss of . . . ability to earn," Mason disagreed and reiterated the court should focus on "whether there was a loss of business income" attributable to the accident and not other factors. Mason acknowledged that if someone did not receive a W-2, business income reported on a Schedule C is equivalent, and would be a "factor" in trying to estimate pre-accident earnings. And Mason said documents provided in discovery enabled her to analyze Downing's gross receipts (rather than the entire business's gross receipts) from 2014 to 2019. Mason also claimed she could not determine the amount of lost profits related to Downing's loss of surgical privileges by analyzing Downing's gross receipts because of the way Generations' software tracked procedures — even though fee schedules showed that surgery was more profitable. Mason also acknowledged that Downing's ability to perform surgeries "certainly impacts her profitability on her own efforts."

### 3. Shoreside's motion to dismiss under Civil Rule 41(b)

At the close of Downing's case, Shoreside moved to dismiss some of her

damages claims under Alaska Civil Rule 41(b),[2] including her claim for lost past and future earning capacity. Shoreside argued that Downing had failed to prove the amount of those damages "beyond speculation."

Downing countered that the level of certainty for proof of lost earning capacity was not the same as for lost earnings or contract cases. Citing *Grimes v. Haslett*,[3] Downing argued that lost future earning capacity can be proven without offering proof of past lost earnings. Downing argued that she had provided sufficient proof through her Schedule Cs; that Shoreside had not offered any rebuttal to her offers of proof; and that the court should not dismiss her claim under Rule 41(b). Downing pointed out that Shoreside's proposed standard of proof for earning capacity claims would place business owners with multiple employees "in a far worse position than other plaintiffs."

Shoreside responded that Rule 41(b) allows the court to dismiss a claim

---

[2]     Alaska Rule of Civil Procedure 41(b) provides that at the close of plaintiff's case in a non-jury trial,

> the defendant, without waiving the right to offer evidence in the event that a motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then weigh the evidence, evaluate the credibility of witnesses and render judgment against the plaintiff even if the plaintiff has made out a prima facie case. Alternately, the court may decline to render any judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).

Rule 52(a) in turn provides that in actions tried without a jury, the court must make findings of facts and conclusions of law.

[3]     641 P.2d 813, 818 (Alaska 1982).

-15-                                                                    7651

even when contradictory evidence in favor of the plaintiff has been presented. Shoreside claimed that Downing needed to prove by a preponderance of evidence that the amount of earning capacity damages could be meaningfully calculated, Downing had failed to do so, and she could not simply use Generations' earnings on the Schedule C as a proxy. Shoreside argued it only sought the proof required of "any other personal injury plaintiff" who would have to submit proof of wage loss, and cited a case about past lost earnings and lost profits.[4]

The superior court declined to rule on the motion. But it expressed concerns about Vega's methodology and his refusal to separately calculate Downing's income from that of the business and invited additional briefing on the motion.

In closing Downing argued that she had provided sufficient evidence of her past earning capacity and the permanent decrease of that capacity due to the accident. She argued that neither the court nor plaintiff needed to be a "forensic accountant" to determine that she was due some compensation for her loss and proposed several possible methods using the evidence presented at trial to estimate her loss of future earning capacity. Downing noted Vega had calculated her earning capacity in 2020 two different ways. Downing used Vega's more conservative estimate of her current income to calculate her lost earning capacity at three levels, arriving at figures of $5.8 million using the work life expectancy for a woman, $6.6 million for a man, and $7.4 million using the assumed work life for the clinic lease. Downing argued that "even if you don't accept every dollar" Vega proposed, there was "certainly a basis for award" of lost earning capacity, pointing out that jury instructions allowed awards for loss of earning capacity to children, homemakers, and retirees because it was based on future capacity,

---

[4] *Madonna v. Tamarack Air Ltd.*, 298 P.3d 875 (Alaska 2013). As we discuss below, lost profits and lost earnings or lost wages are different categories of damages and they are also distinct from earning capacity.

not actual wage loss.  Downing argued that a Schedule C was the corollary to a W-2 for a sole proprietor and Shoreside had accepted W-2s as evidence of income.

Downing pointed out that the court could also determine her lost earning capacity damages without using Vega's calculations.  Downing argued that based on the amount Generations paid Dr. Chester for duties Downing could no longer perform, a full year's cost to the clinic would be approximately $533,000 a year.[5]  She also argued there was no question about her continuing future loss of earning capacity, given that she was "currently working at a very marginal productive level" and did not have hospital privileges.

### 4.     The superior court's decision

Both parties filed post-trial briefs reiterating their positions, and in early February 2021 the court denied Shoreside's Rule 41(b) motion to dismiss.  But on March 22 the court sua sponte reconsidered the motion, issued findings of fact and conclusions of law, and dismissed Downing's loss of earning capacity claim.  The court awarded Downing damages on her remaining claims.

The superior court made detailed findings about the nature and extent of Downing's injuries and their impact on her ability to practice based on the evidence about Downing's brain imaging; neurocognitive testing and abilities; ear, eye, and speech testing; and symptoms.  The court found that before the accident, Downing had been "a highly intelligent, energetic, and successful individual" with high academic and professional performance and a "photographic memory."  The court found that as a result of the accident, Downing suffered bodily injuries and an exacerbation of her preexisting spinal issues to the extent that "her quality of life and ability to function" were affected

---

[5]     Downing also noted this amount did not include the value of the loss of Downing's business acumen and her long-established connections in the area.

by "near-constant and severe neck pain, intermittent pain in the back of her head, numbness and tingling in her hands and upper body," and stinging in her upper back. The court also found by a preponderance of the evidence that the accident caused Downing to suffer a mild TBI. The court credited the testimony of specialists, Downing, and her daughter that the TBI resulted in "significant cognitive impairment" related to Downing's memory, expression, focus, and fatigue; the court noted Downing's impairments were evident while she testified.[6] The court found Downing's symptoms were likely permanent and would worsen as she aged, which could eventually require daily living assistance. The court also found that Downing's TBI "was severe enough to permanently impair her ability to practice as a surgical OB/GYN" because she had "the potential to make serious and potentially fatal mistakes if she becomes overstimulated, overwhelmed, or fatigued in the operating room." The court concluded Downing was "no longer capable of safely performing complex or high stake surgeries or delivering babies" or taking on "demanding tasks" such as being on call, but she could still safely "perform uncomplicated outpatient procedures and attend to patients during office visits" as long as she could "take breaks, request assistance, or reschedule

---

[6]    The court observed that Downing

> did not appear to function at the level the [c]ourt would expect from a highly successful medical professional or from someone who had been described by others as exceptionally intelligent. At various points throughout her testimony, [Downing] had to stop and think about her answers, gave answers that were at times circular and unclear, had to ask for things to be repeated and clarified, and had to ask the attorneys to stop talking for her to be able to read an exhibit. It was also patently clear that [Downing] became fatigued as her testimony went on, which frustrated her attempts to keep up with the questioning.

appointments." And the court noted that although Downing "continues to perform less demanding outpatient surgical procedures" at a different medical center, "it is unclear whether she will be capable of performing at that level in the future."

The court awarded Downing over $1.6 million in damages for future medical and life care expenses, past lost income, and noneconomic damages. But it concluded that although Downing had proven it was more likely than not she suffered a loss of earning capacity due to her inability to perform complex surgeries and deliveries, she had "failed to present sufficient evidence regarding her loss of future earning capacity claim to allow the [c]ourt to calculate the amount of the loss to a degree of reasonable certainty." The court therefore concluded that the lost earning capacity claim "must be dismissed" under Rule 41(b).

The court made detailed findings about the financial evidence and expert testimony presented at trial. The court "doubt[ed] the accuracy of . . . Mason's conclusion that [Downing] suffered no loss in future earning capacity due to the accident,"[7] as well as her calculation that Downing's net charges returned to normal levels at the end of 2017 even though Downing subsequently relinquished her surgical privileges in summer 2019.

But the court believed Vega's conclusions were "overly simplistic and speculative" and declined to adopt his earning capacity estimates. First, the court found

---

[7] We note the superior court conflated two categories of damages: Mason testified about actual earnings, not earning capacity, and stated she offered no opinion as to the latter. But it was not improper for the superior court to consider Mason's expert opinion about whether Downing suffered a loss in actual earnings due to the accident when it analyzed her lost earning capacity claim. Actual earnings can assist a trier of fact to estimate earning capacity. STUART M. SPEISER, CHARLES F. KRAUSE, & ALFRED W. GANS, 2 AMERICAN LAW OF TORTS § 8:33. But actual earnings are not dispositive regarding the capacity claim, *see State, Dep't of Transp. & Pub. Facilities v. Miller*, 145 P.3d 521, 531 (Alaska 2006).

Downing's 2015 and 2016 Schedule Cs reflected the profitability of the business as a whole rather than Downing's "ability to generate revenue based on the services she performs." Another reason the court did not accept the business's profits as proof of Downing's earning capacity was that, although it found Downing's ability to perform certain services was negatively impacted, it did not find her ability to own the business and collect its profits was affected. The court next found that Vega's determination of post-accident earning capacity was "conjectural and inaccurate." And the court found that Vega's use of an eight and a half year work life expectancy was not a "compelling" basis for the work life expectancy calculation because, while Downing had signed a lease, she had also testified to being "involved in talks with other providers about them buying into, and eventually taking over, Generations."[8]

The court concluded that the Second Restatement of Torts directed it to consider the market value of services Downing provided because the value of Downing's services was not the "predominant" source of Generations' profits.[9] The court therefore decided it had "to calculate [Downing's] pre[accident] earning capacity based on . . . her

---

[8] The superior court misstated Vega's testimony regarding earning capacity, believing he "did not specify" about whether Downing's work life expectancy had been reduced by the accident. But he did; he stated it would be 4.1 years but that she would likely have worked for eight and a half years if not for the accident.

[9] *See* RESTATEMENT (SECOND) OF TORTS § 924 (AM. L. INST. 1979) ("When the injured person was not receiving a salary, but owned and was operating a business that was deprived of his services by the injury, his damages are the value of his services in the business during the period. If [the injured person's] services, rather than the capital invested or the services of others, were the predominant factor in producing the profits, evidence of the diminution of profits from the business will be received as bearing on his loss of earning capacity . . . . If, however, the income of the business is chiefly the result of capital invested or the services of others, the damages are determined by the market value of the services that the plaintiff was prevented from giving, that is, the amount commonly paid for the services in businesses of like nature.").

ability to generate revenue from the services she provided . . . as measured by her quarterly net charges." But the court concluded that Downing's evidence did not allow it to determine the proportion of Downing's charges that had derived from complex surgeries and deliveries prior to the accident and did not show the extent to which Downing compensated for the decrease in high-earning procedures by increasing the number of office visits and simple outpatient procedures. The court concluded that Downing should have been reasonably expected to furnish those records as sole proprietor of Generations and held that Downing had failed to carry her burden of proving the amount of lost earning capacity damages. It therefore denied her any recovery for lost earning capacity.

In response to Shoreside's motion for attorney's fees, the court concluded that neither party prevailed because although Downing won $1.6 million in damages, Shoreside prevailed on the lost earning capacity claim. The court ordered each side to bear its own fees and costs.

**5.    Appeal**

Downing appeals, arguing that the superior court erred by using the wrong legal standard to prove the amount of lost earning capacity and by declining to award even nominal damages. Downing also argues that the court abused its discretion by refusing to find Downing was the prevailing party and awarding her attorney's fees and costs.

## III.    STANDARD OF REVIEW

"Whether the trial court applied the correct legal standards in making its determination is a question we review de novo."[10] "Whether the trial court has applied the correct legal standard . . . is a question of law that we review independently" for legal

---

[10]    *Sanders v. Sanders*, 902 P.2d 310, 313 (Alaska 1995).

error.[11]

## IV. DISCUSSION

### A. It Was Legal Error To Require Proof To A Reasonable Certainty Of The Amount Of Lost Earning Capacity Damages.

"Impairment of earning capacity means the permanent diminution of the ability to earn money."[12] The concept of earning capacity includes the reduced ability of an injured party to earn money after an injury as well as economic prospects in the longer term — for instance, a decreased ability to "weather adverse economic circumstances" or to change employment.[13] Lost earning capacity is a category of damages distinct from actual lost earnings or lost profits[14] and, because of its speculative nature, "does not require the same specificity or detail as does proof of loss of future wages" or lost profits.[15] Even an individual who was unemployed at the time of the injury, such as a homemaker or a child, can be awarded damages for lost earning capacity because the individual's capacity to seek employment in the future, if desired,

---

[11] *Beaudoin v. Beaudoin*, 24 P.3d 523, 526 (Alaska 2001); *see also Mallory D. v. Malcolm D.*, 309 P.3d 845, 846 (Alaska 2013).

[12] *City of Fairbanks v. Nesbett*, 432 P.2d 607, 617 (Alaska 1967) (footnote omitted).

[13] 29 AM. JUR. 3D *Proof of Facts* 259, Westlaw (database updated Nov. 2022) (citing *Wilburn v. Maritrans GP Inc.*, 139 F.3d 350, 362 (3d Cir. 1998)).

[14] *State, Dep't of Transp. & Pub. Facilities v. Miller*, 145 P.3d 521, 531 (Alaska 2006) (explaining distinction and providing that injured party whose actual lost earnings are nonexistent — even by choice — can recover for impairment of earning capacity); *see also* 29 AM. JUR. 3D *Proof of Facts* 259, Westlaw (database updated Nov. 2022) (explaining difference).

[15] STUART M. SPEISER, CHARLES F. KRAUSE, & ALFRED W. GANS, 2 AMERICAN LAW OF TORTS § 8:33 (citing *Arthur v. Zearley*, 992 S.W.2d 67 (1999)).

has been diminished by injury.[16]

One tort law treatise explains that "[t]here is no fixed rule for estimating the amount of [such] damages" but the trier of fact "should award a fair and reasonable compensation, taking into consideration what the plaintiff's income would probably have been, how long it would have lasted, and all the contingencies to which it was liable."[17] The Second Restatement of Torts, upon which the superior court relied in its earning capacity analysis, uses nearly the same formulation: the trier of fact "must ascertain, as nearly as can be done in advance," the difference between what a plaintiff could probably have earned during their pre-injury life expectancy and what the plaintiff can now earn during their post-injury life expectancy. It should do so by taking into account "the type of work that, in view of his physical condition, education, experience and age, he would have been doing and will be likely to do in the future during the working period of his life, together with all other matters reasonably relevant."[18] Alaska's pattern jury instruction on lost earning capacity lists similar considerations.[19] And commentary to

---

[16]    *See Morrison v. State*, 516 P.2d 402, 404-05 (Alaska 1973) (concluding superior court committed clear error by conflating future lost wages with future lost earning capacity when it awarded injured minor only five years of earning capacity damages, on the assumption she would become a non-earning homemaker); *Grimes v. Haslett*, 641 P.2d 813, 818 n.3 (Alaska 1982) ("The right of an injured homemaker to recover for impaired earning capacity regardless of whether she was employed before the injury exemplifies the distinction between an award for lost earnings and an award for lost earning capacity.").

[17]    STUART M. SPEISER, CHARLES F. KRAUSE, & ALFRED W. GANS, 2 AMERICAN LAW OF TORTS § 8:33.

[18]    RESTATEMENT (SECOND) OF TORTS § 924 cmt. d (AM. L. INST. 1979).

[19]    *See* Alaska Pattern Jury Instructions - Civ. 20.04. ("You may award the plaintiff a fair amount for any reduction in future ability to earn money that (he) (she) is
(continued...)

the Second Restatement provides that when the plaintiff was not receiving a salary, but was a business owner providing services to that business, "his damages are the value of his services in the business."[20]

The superior court found that Downing had established the right to recover for her loss of earning capacity. It found that Downing had suffered a mild TBI from the accident and that this TBI "significantly impaired her cognitive abilities." And it found that the physical and cognitive deficits resulting from the accident were "severe enough to permanently impair her ability to practice as a surgical OB/GYN" and rendered her incapable of "safely performing complex or high stake surgeries or delivering babies." Because "those medical procedures [were] a significant part of [Downing's] profession prior to the accident," the court found her "ability to work has been substantially and permanently limited as a result of the accident." But the court denied Downing any recovery because it determined that she had "failed to prove the amount of her loss to a degree of reasonable certainty."

The superior court erred by requiring Downing to prove her lost earning capacity to a "reasonable certainty." Downing correctly asserts that two standards of

---

[19]    (...continued)
reasonably probable to experience. To calculate this amount, you must determine the difference between the plaintiff's ability to earn money before the injury and (his) (her) ability to earn money after the injury. To do this you may consider the plaintiff's health, physical and mental abilities; (his) (her) work habits and occupation before the accident; the nature and extent of (his) (her) injuries; and how long and to what extent (his) (her) injuries will affect (his) (her) earning ability in the future. Your calculation of the plaintiff's ability to earn money before the injury must be based on the plaintiff's life expectancy before the injury occurred. To decide the plaintiff's earning ability, both before and after the injury, you may consider the wages (he) (she) earned before and after the injury and any reasonably probable increases in those wages due to promotions or automatic step increases.")

[20]    RESTATEMENT (SECOND) OF TORTS § 924 cmt. b (AM. L. INST. 1979).

proof are relevant to a lost earning capacity claim: the fact of damages must be proven to a reasonable certainty — that is, the opposing party's fault caused the loss. But the plaintiff "need only adduce 'some data' " to enable a trier of fact to "reasonably estimate" the amount of those damages.[21]

This two-tier damages formulation is longstanding. The United States Supreme Court in *Story Parchment Co. v. Paterson Parchment Paper Co.* stated that "[t]he rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."[22] When damages cannot be measured with certainty — as is the case with lost future earning capacity — the Court held that a plaintiff should submit "the facts and circumstances tending to show the probable amount of such damages to the [trier of fact] to enable them to form 'such reasonable and probable estimate, as in the exercise of good sense and sound judgment they shall think will produce adequate compensation.' "[23]

The Second Restatement of Torts also articulates the two-tier standard, requiring the injured party to "prove[] with reasonable certainty that the harm resulted from the wrongful conduct of the" defendant, but not requiring it to "prove with like

---

[21]    *Sherbahn v. Kerkove*, 987 P.2d 195, 200 (Alaska 1999).

[22]    282 U.S. 555, 562 (1931); *see Hill v. Republic of Iraq*, 328 F.3d 680, 684 (D.C. Cir. 2003) (claiming *Story Parchment Co.* "states the American rule on damages"); *see also Palmer v. Conn. Ry. & Lighting Co.*, 311 U.S. 544, 561 (1941) ("Certainty in the fact of damage is essential. Certainty as to the amount goes no further than to require a basis for a reasoned conclusion.").

[23]    *Story Parchment Co.*, 282 U.S. at 565.

definiteness the extent of the harm" suffered as a result.[24]  The Second Restatement explains the rationale behind this approach:  while it may be "desirable" that there be "definiteness of proof of the amount of damage as far as is reasonably possible[, i]t is even more desirable, however, that an injured person not be deprived of substantial compensation merely because he cannot prove with complete certainty the extent of harm he has suffered."[25]

> We too have authorized a similar two-pronged standard for damages in the context of claims that are necessarily difficult to prove precisely.[26]  After a party proves

---

[24]   RESTATEMENT (SECOND) OF TORTS § 912 cmt. a (AM. L. INST. 1979); *see also id.* at § 924 (cross-referencing § 912 for standard of proof in lost earning capacity context).

[25]   *Id.* § 912 cmt. a.

[26]   *See Dowling Supply & Equip., Inc. v. City of Anchorage*, 490 P.2d 907, 909 (Alaska 1971) ("[W]here the plaintiff has shown actual loss of business profits during a period as a result of defendant's breach of contract, he should not be denied recovery merely because the exact amount of damages cannot be readily ascertained. The rule against recovery of uncertain damages is therefore generally directed against uncertainty with respect to the cause of rather than the extent of damages."); *Blumenshine v. Baptiste*, 869 P.2d 470, 473 (Alaska 1994) (explaining that party seeking recovery of future medical expenses "must prove to a reasonable probability that they will occur," after which amount is to be determined by jury, who cannot "speculate or guess" but must be furnished "some data . . . upon which it might reasonably estimate the amount to be allowed for this item" (quoting *Henderson v. Breesman*, 269 P.2d 1059, 1061-62 (Ariz. 1954))); *see also Sherbahn v. Kerkove*, 987 P.2d 195, 198-200 (Alaska 1999) (requiring plaintiff to prove "to a reasonable probability" by preponderance of evidence that future medical expenses will occur, and then "prove the amount of damages with a degree of certainty that allows the finder of fact to 'reasonably estimate the amount to be allowed for [the] item [of damages],' " and accepting expert evidence of estimated range for cost of pain treatment as "some data" to allow jury to estimate (quoting *Pluid v. B.K.*, 948 P.2d 981, 984 (Alaska 1997) (alterations in original)); *Weston v. AKHappytime, LLC*, 445 P.3d 1015, 1020-21 (Alaska 2019) (reiterating two-tier

(continued...)

the fact of damages with reasonable certainty,[27] the amount of damages requires a lesser quantum of proof[28] that enables the trier of fact to "reasonably estimate"[29] the damages or to compute the damages upon a "reasonable basis."[30] We have expressly applied this two-tiered standard to lost future earning capacity claims: in *City of Fairbanks v. Nesbett*, we held that the party claiming lost earning capacity damages must prove "with

---

[26]     (...continued) standard).

[27]     Even the required level of "certainty" to prove the fact of damages can depend on the circumstances, based upon what a trier of fact can understand from lay experience, *compare Chugach Elec. Ass'n v. Lewis*, 453 P.2d 345, 351 (Alaska 1969) (jury could apply own experience to assess impact of eye injury on future wages and job opportunities of electrical lineman) *with City of Fairbanks v. Nesbett*, 432 P.2d 607, 617 (Alaska 1967) (denying recovery where attorney suffered permanent damage to ankle following motorcycle accident because attorney failed to provide evidence that injury impaired earning capacity as attorney), as well as policy considerations, *see, e.g.*, *Native Alaskan Reclamation & Pest Control, Inc. v. United Bank Alaska*, 685 P.2d 1211, 1222-23 (Alaska 1984) (holding wrongdoer's willful conduct could justify requiring less stringency in assessing plaintiff's proof) and *Guard v. P & R Enters., Inc.*, 631 P.2d 1068, 1072 (Alaska 1981) (holding "reasonable certainty" in proving lost profits is lower in antitrust context than in typical contracts context); *see generally* Robert M. Lloyd, *The Reasonable Certainty Requirement in Lost Profits Litigation: What It Really Means*, 12 TENN. J. BUS. L. 11 (2010) (detailing "reasonable certainty" requirement).

[28]     *See Conam Alaska v. Bell Lavalin, Inc.*, 842 P.2d 148, 155 n.13 (Alaska 1992) (referring to "lesser requirement of valuation").

[29]     *Pluid*, 948 P.2d at 984.

[30]     *City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 222 (Alaska 1978) ("[I]t is not necessary to prove lost profits with exactness so long as actual loss of profits is shown and the jury has a reasonable basis on which to compute its award."); *City of Palmer v. Anderson*, 603 P.2d 495, 500 (Alaska 1979) (using "reasonable basis" language); *Mun. of Anchorage v. Locker*, 723 P.2d 1261, 1267 (Alaska 1986).

reasonable probability the nature and extent of" future damages, but need only provide proof allowing "some reasonable basis upon which a jury may estimate with a fair degree of certainty the probable loss which plaintiff will sustain."[31] Although we used the term "reasonable probability" to prove both the "nature *and extent*" of the consequences of a tort and explained the jury should "estimate with a fair degree of certainty" the party's probable loss, we emphasized that some uncertainty as to damages was not fatal to recovery.[32] We held that a plaintiff "must at least offer some evidence of loss of earnings in the future as a result of his permanent injury and, *if possible*, the nature and extent of his loss."[33] It is thus clear that less certainty of proof is needed to establish the amount of loss than the fact of loss. We have explained this is because "some items of damage cannot be fixed with mathematical precision" and "the trial judge is necessarily forced to estimate."[34] It is therefore necessary for the plaintiff to provide "some evidence" to help the court or jury estimate the amount of lost earning capacity. We have affirmed denial of damages for lost earning capacity only when a party has not offered *any* credible evidence concerning their profession, past earnings, or likely future earnings.[35]

There is no question that Downing provided some evidence that would have helped the superior court reasonably estimate her lost earning capacity. She provided several estimated ranges of damages from a vocational expert, other physicians at

---

[31]     *City of Fairbanks v. Nesbett*, 432 P.2d 607, 616 (Alaska 1967) (quoting *Henne v. Balick*, 51 Del. 369, 373-74 (Del. 1958)).

[32]     *Id.* (Emphasis added.)

[33]     *Id.* (quoting *Henne*, 51 Del. at 373-74).

[34]     *Morrison v. State*, 516 P.2d 402, 405 (Alaska 1973).

[35]     *See, e.g.*, *Alexander v. State, Dep't of Corr.*, 221 P.3d 321, 325 (Alaska 2009) (quoting *Nesbett*, 432 P.2d at 616); *Nesbett*, 432 P.2d at 616.

Generations, and evidence of the salary paid to the doctor hired to cover procedures Downing was no longer able to perform.[36] Downing also offered statistical evidence about her "educational background, grades and character" compared with the average annual income of similarly-situated individuals in Alaska, which is data we have previously held can assist a trier of fact in estimating future earning capacity.[37]

The amount of damages for lost earning capacity is based on the difference between earning *capacity* before and after the injury, not the difference between *actual income* before and after.[38] The injured party's actual earnings before and after the injury can be helpful to estimate the amount of earning capacity impairment, but they are not dispositive — an injured person may be compensated even if continuing to earn the same amount or more.[39] More detailed information about the revenue from complex

---

[36] *See Am. Nat'l Watermattress Corp. v. Manville*, 642 P.2d 1330, 1341 (Alaska 1982) (explaining that Manville presented sufficient evidence of earning capacity for damages question to reach jury through expert testimony on lost wages, evidence that business was required to hire a substitute, and medical testimony of physical and mental impairments that interfered with ability to work).

[37] *Leavitt v. Gillaspie*, 443 P.2d 61, 70 (Alaska 1968) (concluding expert opinion on decedent's characteristics compared to broader demographic data provided a "reasonable basis for assisting [the jury] in estimating the probable future earnings of decedent").

[38] *See State, Dep't of Transp. & Pub. Facilities v. Miller*, 145 P.3d 521, 531 (Alaska 2006) ("A plaintiff whose actual lost earnings are negligible or nonexistent may still be compensated for lost earning capacity.").

[39] *Id.*; *see also* STUART M. SPEISER, CHARLES F. KRAUSE, & ALFRED W. GANS, 2 AMERICAN LAW OF TORTS § 8:33 ("The fact that a tort plaintiff earns a higher annual salary after an injury than she did before the injury does not bar her from recovering for a loss of earning capacity. She can still recover if she can show that she would have earned even more over the course of her working life if she had not been injured." (citing *Andler v. Clear Channel Broadcasting, Inc.*, 670 F.3d 717 (6th Cir.

(continued...)

procedures and surgeries Downing had performed before the accident versus those she was able to perform afterward, and whether and how Downing was able to make up for lost income in other ways, was not necessary to make a reasonable estimate valuing Downing's impaired earning capacity.[40] While such information could have made estimates more precise, its lack did not call into question Downing's loss of her pre-accident ability to perform such procedures or its impact on her ability to earn future income.

Downing provided "competent evidence"[41] that without her former ability to perform robotic surgeries or other complex procedures, she would earn far less than she had earned before the accident. Even Shoreside's expert, Mason, who offered no opinion on lost earning capacity, conceded that the various factors she identified that were not related to Downing's accident could not explain all of Generations' decline in

---

[39]    (...continued)
2012))), Alaska Pattern Jury Instructions - Civ. 20.04 ("To decide the plaintiff's earning ability, both before and after the injury, you *may* consider the wages [she] earned before and after the injury" (emphasis added)).

[40]    *See City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 224 (Alaska 1978) (explaining estimate of lost profits provided at trial could be "examined for its reasonableness in light of the other testimony" and other supporting data, and that sufficient evidence was provided to enable question of lost profits to go to jury; further elaborating that plaintiff need not "present an accountant's balance sheet in order to substantiate his damages," since "[o]nce actual damages are shown and there is a reasonable basis for computing an award, a defendant's opportunity for pre-trial discovery of the evidentiary basis for the amount claimed, the right to cross-examine witnesses and to present evidence, as well as the judge's duty to instruct the jury on the issue of certainty provide adequate protection against speculative verdicts").

[41]    *Dowling Supply & Equip., Inc. v. City of Anchorage*, 490 P.2d 907, 909 (Alaska 1971) (stating that even when "exact amount of damages cannot be readily ascertained," plaintiff must show "some competent evidence" of amount of damages to recover).

revenue following the accident.[42] Mason therefore provided further confirmation that the accident had impaired Downing's earning capacity to some measurable extent, and that the impairment would continue. And the court itself specifically recognized that Downing's impairment would likely worsen.

The court also appears to have wholly rejected evidence of Generations' business profits because it found that Downing was not a "predominant factor" in producing the profits.[43] But even if the evidence did not demonstrate Downing's "predominance" in producing profits, it supported her claim that she was unable to earn as much, and therefore to bring as much profit to the business, as she had before the accident. And when the services provided by a business owner are not the predominant factor in the business's profits, then "the market value of the services that the plaintiff was prevented from giving" is the correct measure of lost earning capacity.[44] Trial testimony showed that in addition to being the "number one" earner, Downing was deeply involved in the day-to-day and long-term management of Generations, she reduced her involvement after the accident, other employees were required to take on management tasks, and the clinic was required to hire an additional employee for

---

[42]    *See supra* note 24.

[43]    *See* RESTATEMENT (SECOND) OF TORTS § 924 ("If [the injured person's] services, rather than the capital invested or the services of others, were the predominant factor in producing the profits, evidence of the diminution of profits from the business will be received as bearing on his loss of earning capacity . . . . If, however, the income of the business is chiefly the result of capital invested or the services of others, the damages are determined by the market value of the services that the plaintiff was prevented from giving, that is, the amount commonly paid for the services in businesses of like nature.").

[44]    *Id.*

administrative purposes.[45] The costs to the clinic to make up for Downing's impairments, including the salary of the physician hired to perform surgeries that Downing could not, also provide a reasonable basis for estimating an amount of damages for lost earning capacity.

While a trier of fact can find that evidence regarding the extent of injuries or their effect on a person's ability to work is not credible and therefore decline to make an award,[46] that was not the case here. The superior court found that Downing had suffered a loss of earning capacity, but it did not award her damages despite the evidence presented. Downing provided sufficient evidence to enable a trier of fact to make a reasonable estimate of her lost earning capacity. It was legal error to require Downing to prove the amount of her damages with reasonable certainty.

**B.     It Was Legal Error To Refuse To Award Any Damages For Downing's Lost Earning Capacity Claim.**

In earlier cases we have primarily focused on the sufficiency of evidence required to prove the *fact* of earning impairment to reach the trier of fact; once there, the trier of fact has broad discretion to determine an appropriate award.[47] A jury must award

---

[45]     One treatise indicates that a court should analyze the "nature and extent of the business and the part that the injury victim had in the business, the pecuniary loss sustained by absence of the victim's own personal attention, skill, know-how, and labor, what the victim's services in the business were worth, and the amount of daily or periodic earnings." STUART M. SPEISER, CHARLES F. KRAUSE, & ALFRED W. GANS, 2 AMERICAN LAW OF TORTS 8:33.

[46]     *See, e.g.*, *Hayes v. Xerox Corp.*, 718 P.2d 929, 933-34 (Alaska 1986) (affirming denial of new trial because jury verdict denying damages for lost earning capacity was supported by record evidence that plaintiff's injuries did not affect ability to work).

[47]     *See Alaska Airlines, Inc. v. Sweat*, 568 P.2d 916, 932 (Alaska 1977)
(continued...)

a plaintiff a "fair amount" in recognition of the reduction in earning capacity the plaintiff is "reasonably probable to experience."[48] We have held that "a fact finder may not award zero damages where it is 'beyond legitimate controversy' that negligence caused some compensable injury."[49] Downing offered uncontradicted evidence that she had suffered

---

[47] (...continued)
(explaining damages are discretionary in bench trial); *United Bonding Ins. Co. v. Castle*, 444 P.2d 454, 456 (Alaska 1968) (affirming jury discretion in determining amount of damages). *See also* Alaska Pattern Jury Instructions - Civ. 20.04, instructing jury to award "a fair amount for any reduction in future ability to earn money that [plaintiff] is reasonably probable to experience," and providing examples of factors jury *may* consider, including "health, physical and mental abilities, . . . occupation, . . . [and] wages . . . earned before and after the injury."

[48] Alaska Pattern Jury Instructions - Civ. 20.04. The jury instructions purposely avoid using "reasonable certainty" in order to avoid confusing the jury into requiring a higher standard of proof for the extent of damages than is necessary. Past commentary to the instructions provides

> In these instructions the term "reasonably probable" is used rather than the term "reasonably certain." Although the Alaska Supreme Court has approved instructions using the term "reasonably certain" (*see Grimes v. Haslett*, 641 P.2d 813, 818, n.4 (Alaska 1982)), the Court has also indicated that "reasonable certainty" may be equated with "reasonable probability." *Maddocks v. Bennett*, 456 P.2d 453, 457 (Alaska 1969). The Committee has used the term "reasonably probable" in order to avoid confusing the jury.

Alaska Pattern Jury Instructions - Civ. 20.04 (rev. 1990).

[49] *Grant v. Stoyer*, 10 P.3d 594, 599 (Alaska 2000) (requiring new trial and directing damages award when jury declined to award damages for pain and suffering, given undisputed fact that defendant negligently caused plaintiff's injury and uncontradicted evidence that plaintiff experienced "at least some pain and suffering"); *see also Pugliese v. Perdue*, 988 P.2d 577, 583 (Alaska 1999) (granting new trial when superior court denied damages award because, although extent of plaintiff's injuries (continued...)

at least some loss of earning capacity; the superior court expressly found that she had. Beyond the legal error requiring Downing to prove her lost earning capacity damages to a reasonable certainty, it was also legal error to refuse to award her at least nominal damages.

### C. The Attorney's Fees Award Is Vacated And Remanded.

The superior court ordered that each party bear its own attorney's fees based upon its determination that neither party had prevailed.[50] We have reversed the court's decision not to award damages for Downing's lost earning capacity, and the court's determination that Downing was not the prevailing party was premised upon that decision. We therefore vacate the attorney's fees order and remand it for further consideration following the superior court's determination of Downing's additional damages.

## V. CONCLUSION

The superior court's dismissal of Downing's lost earning capacity claim is REVERSED and REMANDED for proceedings consistent with this opinion. The attorney's fees order is VACATED.

---

[49] (...continued) could be disputed, "virtually no evidence" refuted fact that defendant's negligence caused plaintiff's injuries); *Walker v. Alaska Rd. Comm'n*, 388 P.2d 406, 407 (Alaska 1964) ("The record contains substantial and uncontradicted evidence that appellant did experience pain, suffering and inconvenience as a result of her injuries. The clear weight of authority holds that a jury award which fails to include a sum for these items of general damages is inadequate or inconsistent when the evidence supporting them is beyond legitimate controversy.")

[50] Alaska R. Civ. P. 82(a) (establishing that prevailing party in civil case is awarded attorney's fees).