*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| MORRIS O. JOHNSON JR. d/b/a JOHNSON CONSTRUCTION COMPANY, | ) ) ) ) |
| | Supreme Court Nos. S-18615/18625 |
| | Superior Court No. 3AN-16-07503 CI |
| Appellant and Cross-Appellee, | O P I N I O N |
| v. | No. 7773 – June 13, 2025 |
| ALBIN CARLSON & CO., and PATRICK ALBIN CARLSON JOINT VENTURE, LLC, | |
| Appellees and Cross-Appellants. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, William F. Morse, Judge.

Appearances: Kevin T. Fitzgerald, Ingaldson Fitzgerald, P.C., Anchorage, for Appellant and Cross-Appellee. Sarah C. Gillstrom, Davis Wright Tremaine LLP, Anchorage, for Appellees and Cross-Appellants.

Before: Maassen, Chief Justice, and Carney, Borghesan, Henderson, and Pate, Justices.

CARNEY, Justice.

# I.    INTRODUCTION

A contractor hired a subcontractor to undertake part of the construction of a remote bridge.  The initial scope of the contracted work soon changed.  Neither the contractor nor the subcontractor kept detailed records of the changes and their associated costs.  Years after the project was completed, the subcontractor sued for damages, claiming that it had not been paid for the work it completed.

The superior court concluded that the subcontract did not govern the extra work.  It awarded the subcontractor damages on some claims and denied others.  The court also precluded the subcontractor from pursuing some claims at trial because of discovery violations.  The court found that the contractor was the prevailing party following trial and awarded attorney's fees to the contractor.

Both the contractor and subcontractor appeal.  We conclude that it was an abuse of discretion to preclude the subcontractor from pursuing claims without first considering less severe sanctions.  We also reverse some of the damages awards and vacate the court's prevailing party determination and resulting attorney's fees award.  We otherwise affirm the judgment and remand for further proceedings consistent with this opinion.

# II.    FACTS AND PROCEEDINGS

## A.    Facts

Because the legal issues in this appeal are based upon specific events that occurred during the years that the bridge was being constructed, we set forth the facts in some detail.

In 2010, a Chicago-area construction company, Patrick Albin Carlson Joint Venture, LLC (PAC) was awarded a $1.7 million contract from the United States Forest Service to design and build a trail bridge over a river in the Chugach National Forest.  The bridge's location was ten miles from the nearest road but was accessible by railroad for part of the year.  When the railroad was not in operation, however, crews could only access the site by boat, snowmachine, or helicopter.

PAC is comprised of Albin Carlson & Co. (Albin) and Patrick Engineering Inc. It subcontracted with one company to build the bridge; it subcontracted with another, Goode Construction, to complete earthwork and assemble and lift the bridge into place.

PAC also entered a subcontract with Johnson Construction Co. (Johnson) to drive the piles to support the bridge. Johnson is a sole proprietorship of Morris Johnson, a contractor and crane operator. Johnson initially submitted a $950,000 bid to perform nearly all of the work for PAC, but PAC subcontracted with Johnson only to drive temporary and permanent piles for the bridge.

## 1.     The subcontract

The subcontract between PAC and Johnson incorporated by reference work identified in two separate work orders. Work Order No. 1 directed Johnson to install eight permanent piles, four on each side of the river. Work Order No. 2 required Johnson to install two temporary piles on each side of the river to support the bridge as it was being erected. The orders required the work to be substantially completed by October 1, 2011. PAC agreed to pay Johnson $82,500 for Work Order No. 1 and $30,000 for Work Order No. 2, for a total of $112,500.

The subcontract contained a changes clause allowing PAC to alter the scope of the work. The clause required that such changes "shall be authorized only by a written and properly executed Change Order from [PAC], or by a verbal or written directive from [PAC's] Project superintendent based upon directions from the [Forest Service]." Verbal or written changes ordered by the superintendent were required to be documented in a change order by PAC as promptly as possible. Finally, the subcontract provided that "[n]o change in the Work, whether by way of alteration or addition to the Work, shall be the basis of an addition to the amount to be paid to [Johnson] . . . unless and until such alteration or addition has been authorized by a Change Order executed by [PAC]."

The subcontract also contained various recordkeeping and documentation requirements. As a "condition precedent" to payment, it required Johnson to give PAC an invoice with receipts, original waivers of lien, and other evidence showing Johnson's expenses related to the work. It also provided that:

> Whenever the requirements of the [contract between PAC and the Forest Service] are such that as a prerequisite to receipt of payment, [PAC] must furnish the [Forest Service] with documentation of any nature whatsoever from [Johnson] . . . , including but not limited to certified payrolls, compliance statements and other documents required under applicable laws or [that contract], [Johnson] shall promptly furnish [PAC] with such required documentation, and [PAC] may withhold payment until such documentation has been furnished.
>
> . . . .
>
> Final payment shall in no event become due to [Johnson] until . . . [Johnson] submits to [PAC], as may be required by [PAC]: (i) an affidavit that all payrolls, bills for materials and equipment, and all other indebtedness of [Johnson] related to its performance of the Work, have been fully paid or otherwise satisfied, and (ii) complete and final lien waivers from [Johnson] . . . .

### 2.    The 2011 construction season

The project quickly encountered delays. Johnson mobilized equipment to the construction site in late September 2011 and began driving the permanent piles on the east side of the river. Soon after beginning, Johnson hit an underground obstruction that drove one or more piles out of alignment. David Voss, PAC's onsite representative, directed Johnson to pause its work on the east side and begin driving the west side piles.

Again Johnson encountered trouble. Although it had been able to move equipment to the east side of the river by rail, Johnson could not do the same on the west side because the bank was too steep. Nor could its equipment ford the river. The parties decided that Johnson would build an ice bridge over the river to move its equipment to the west side. PAC agreed to compensate Johnson for this work on a time

and materials basis. Johnson built the ice bridge as soon as temperatures and snowfall allowed its employees to snowmachine to the site.

PAC requested Johnson's certified payrolls, as required by its contract with the Forest Service, several times throughout the project.[1] In mid-November 2011 Voss sent Morris Johnson the certified payroll form and explained that it "need[ed] to be filled out." Two weeks later, PAC again sought the certified payrolls from Morris Johnson and sent him the form to be completed. Johnson did not send any certified payrolls to PAC in 2011. But PAC paid Johnson's first invoice — $36,250 for driving the permanent piles under Work Order No. 1 and $15,000 for supplying and installing temporary piles under Work Order No. 2.

### 3. The 2012 construction season

Johnson completed the ice bridge in March 2012. It then moved its equipment to the west side of the river, where it remained until work resumed in the spring.

That spring Voss approved Johnson's request to purchase a boat to facilitate site access and orally agreed that PAC would reimburse Johnson for its use of the boat. He also directed Johnson to take over some of the bridge lifting work that had been assigned to Goode Construction. The added work required Johnson to bring crane mats and an additional, much larger crane to the work site.

In June PAC again requested Johnson's certified payrolls. Johnson eventually provided its certified payrolls covering October 9, 2011 to August 4, 2012.

In July PAC replaced Voss with Neil Hunt. In September PAC and Johnson prepared Invoice 2, billing PAC $50,000 under Work Order Nos. 1 and 2 for driving the permanent piles, welding pile caps on the west side piles, and installing some temporary piles. PAC paid the invoice.

---

[1]     *See* 29 C.F.R. § 5.5(a)(3) (2009).

Also in September, Hunt sent Morris Johnson an email summarizing the agreed-upon extra work. Among the work included was Johnson's previous work building the ice bridge. The email reiterated that the work would be compensated on a time and materials basis.

Hunt also identified additional work to be completed: additional crane work, support for Goode Construction on the bridge superstructure, and dirt work to build pads to stage and lift the bridge. The email stated that this work was also to be done on a time and materials basis and would include equipment rates provided by Johnson. It also stated that Johnson would provide travel to and from the worksite via boat. Hunt concluded the email by requesting to discuss the additional work with Morris Johnson so that PAC could issue a change order. There is no evidence of a response from Johnson.

In October Hunt sent Morris Johnson a proposed written change order authorizing Johnson to lift the bridge into place. Under the proposed terms, Johnson would be paid $33,000 to mobilize and demobilize a crane to the worksite to lift and install the bridge. Hunt proposed authorizing up to $20,000 in labor costs at a rate of $130 per hour. Neither PAC nor Johnson signed the change order.

Johnson completed the work specified in the unsigned change order. It also built a temporary dirt abutment on the west side of the river to complete the lifting work it had assumed from Goode Construction. The bridge was fully assembled by late fall or early winter 2012 but, due to weather, it was not installed until June 2013. Johnson's equipment was left at the worksite over the winter.

Johnson submitted two invoices to PAC in October, both dated October 2, 2012. The first billed PAC $12,500 for the remaining work under Work Order Nos. 1 and 2. The second invoice was for $16,500 for crane mobilization to the worksite. PAC paid both invoices.

PAC prepared another invoice in October 2012, billing itself $20,000 for Johnson's bridge installation labor. It paid the invoice. Morris Johnson did not agree to the invoice, object to the payment, or ask what it was for.

In late December 2012, Hunt asked Morris Johnson for certified payrolls from August 2012 to December 2012. There is no record of a response.

### 4.     The 2013 construction season and project closeout

Hunt requested certified payrolls again in January 2013. In late April Morris Johnson responded that he would try to send them to Hunt that week.

Johnson finished the bridge installation in June. PAC notified the Forest Service that the bridge was complete and awaiting inspection. PAC and all of its subcontractors removed their equipment from the worksite by late July.

As part of its project closeout in August and September 2013, PAC sent Morris Johnson three requests for Johnson's final invoice, final payment information, and certified payrolls. Morris Johnson did not respond to these requests.

In December 2013 PAC prepared a draft final invoice for Johnson. The invoice included $40,000 for labor costs; $16,500 for crane demobilization; $35,000 for the 2011-2012 winter work; $3,000 for pile changes;[2] and $5,000 for the boat rental.[3] PAC did not send the draft invoice to Johnson or pay the amount that it estimated it owed Johnson.

There was no further communication between PAC and Johnson until July 2016. At that time Morris Johnson contacted PAC seeking final payment for the extra work. He forwarded Hunt's September 2011 email describing the extra work that Johnson had completed or was to perform. PAC and Johnson exchanged emails for

---

[2]     The superior court mistakenly recorded the cost of the pile changes as $5,000.

[3]     The invoice also gave PAC $5,000 credit for a truck that Johnson had purchased from PAC during the project. PAC thus calculated that the total amount it owed Johnson was $94,500 (40,000 + 16,500 + 35,000 + 3,000 + 5,000 – 5,000).

several months, searching for documents. On June 1, 2017, PAC sent the $94,500 draft invoice it prepared in 2013 but never shared. On June 7 Morris Johnson responded with a demand for $1.4 million.

## B. Proceedings

Johnson filed suit against PAC and Albin in July 2016, seeking over $600,000 in damages for work performed under the subcontract including labor, transportation, and equipment costs. Johnson served PAC and Albin with the complaint in August 2017.

### 1. Summary judgment motions

PAC and Albin moved for summary judgment. They first argued that Johnson was not entitled to damages because it did not comply with several conditions precedent requiring Johnson to submit certified payrolls and a final payment application before it was entitled to payment. PAC and Albin also argued that Johnson's claim was a total cost claim and should be dismissed because Johnson could not meet the threshold test for asserting such a claim.[4] Under that test, a party may not assert a total cost claim unless it proves that

> (1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses.[5]

PAC and Albin claimed that Johnson's failure to maintain records for the costs of extra work disqualified it from proving the first element and therefore precluded it from using the total cost method.

---

**4** *See Geolar, Inc. v. Gilbert/Commonwealth Inc. of Mich.*, 874 P.2d 937, 944-45 (Alaska 1994).

**5** *Id.* at 945 (quoting *Mun. of Anchorage v. Frank Coluccio Constr. Co.*, 826 P.2d 316, 325 (Alaska 1992)).

Johnson opposed and filed a cross-motion for summary judgment. It first argued that the extra work was governed by separate oral agreements, not the subcontract. It also contended that even if the subcontract controlled, Johnson was still entitled to recovery because PAC and Albin waived the recordkeeping provisions. Johnson further argued that it was entitled to summary judgment on liability because PAC and Albin did not dispute that they agreed to pay Johnson for extra work on a time and materials basis and that Johnson performed the extra work.

The superior court denied both motions. It concluded that each party raised questions of fact, so neither was entitled to summary judgment.[6]

PAC and Albin moved for reconsideration. They argued that Johnson's failure to present evidence satisfying the threshold requirements was fatal to its claims. The superior court agreed that Johnson had not met the test for a total cost claim but concluded that "[t]here are other ways to prove damages." It therefore denied reconsideration.

In January 2021 PAC and Albin served Johnson with an Alaska Civil Rule 68 offer of judgment for $243,000, including prejudgment interest.[7] Johnson did not accept the offer.

### 2. Motion in limine

A month before trial was scheduled to begin in March 2021, PAC and Albin filed a motion in limine to exclude evidence supporting Johnson's damages claims for its employees' labor, Morris Johnson's labor, equipment charges, materials,

---

[6] *Thomas v. Joseph P. Casteel Tr.*, 496 P.3d 403, 409 (Alaska 2021) ("[S]ummary judgment is appropriate only when no reasonable person could discern a genuine factual dispute on a material issue." (alteration in original) (quoting *Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 (Alaska 2014))).

[7] Under Rule 68, a party that declines a valid offer of judgment from multiple defendants must pay a percentage of the offering parties' attorney's fees if the final judgment is at least 10% less favorable than the offer.

and transportation. They argued that Johnson violated Civil Rule 26(a) by failing to provide documentation and computation for its claimed damages. The court partially granted the motion. Considering each damages claim in turn, the court concluded that Johnson failed to provide sufficient documentation to support its claims for Morris Johnson's labor, snowmachine and boat use, travel labor, and trucking costs. It therefore precluded Johnson from pursuing these damages claims at trial.

The court also recognized that a total cost claim was "a disfavored method" that may be used only in limited circumstances. It prohibited Johnson from pursuing this method at trial but allowed Johnson to proceed using either the actual cost or jury verdict method.[8]

Johnson moved for reconsideration. The court denied reconsideration but nevertheless allowed Johnson to present evidence for the excluded claims. The court concluded that because its legal rulings and factual findings would likely be appealed, it would be "more efficient" to hear the evidence and make contingent findings on the precluded claims.

### 3. Trial

A ten-day bench trial was held in June and July 2021. Johnson called Morris Johnson and an expert in equipment rental rates as witnesses. Morris Johnson described the challenges involved in constructing the bridge and the ad hoc relationship he had with PAC and PAC's representatives.

---

[8] The jury verdict method is a method of calculating damages when actual costs are not available. *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 41 (Alaska 1998). Under this approach, the contractor may "present evidence of the cost of additional work to the finder of fact[,] including any actual cost data, accounting records, estimates by law and expert witnesses, and calculations from similar projects." *Id.* (alteration in original) (quoting *Frank Coluccio Constr. Co.*, 826 P.2d at 325).

Johnson claimed it was owed nearly $4.5 million for the extra work, including $36,987 for the snowmachines; $67,848 for the boat; $356,750 for Morris Johnson's labor; and about $2.9 million for equipment rentals. Morris Johnson testified that David Voss, PAC's onsite supervisor, agreed to a daily rate of $250 per snowmachine and Johnson used 3 snowmachines for 36 days. He also said that Voss agreed to pay $1,000 per day to use Johnson's boat and that it was used for 61 days. Morris Johnson estimated that he worked 1,427 hours for design and engineering related to the extra work and that his time was worth $250 per hour because he had previously paid engineers and other professionals $250 per hour.

Morris Johnson testified that Voss had visited his equipment yard, selected the equipment that he wanted, and was informed of their rental rates. Johnson then called Kirk Currey as an expert to testify about rental rates and terms for construction equipment. Currey gave market rates for the equipment Morris Johnson said PAC rented, and acknowledged that some were based on rates Morris Johnson told him. He estimated that the reasonable rental value for the equipment was about $2.9 million.

PAC and Albin presented three witnesses. Neil Hunt, the senior project manager who oversaw the bridge construction from mid-2012 until 2014, described the extra work that PAC had approved. He also testified about his efforts to obtain Johnson's certified payrolls and other documents. The former president of Patrick Engineering, Jeffrey Schuh, testified that he had never seen a subcontractor claim that extra work was not governed by the subcontract's terms. He testified that PAC had not waived any of the subcontract requirements for Johnson. Paul Keating, Patrick Engineering's vice president of construction, testified about PAC's usual requirements before paying subcontractors. He stated that before a subcontractor would be paid, the subcontractor was required to provide a final waiver of any lien and an accounting of actual costs, along with contemporaneous time and materials documentation signed by PAC's onsite supervisor.

After eight days of trial, Albin moved to dismiss the claims against it, arguing that Johnson's evidence and the relevant law established that Johnson was not entitled to relief from it.[9]  Albin argued that it was not a party to the contracts between Johnson and PAC and that Johnson had not presented any evidence that Albin was otherwise liable.  The court granted the motion on the record and dismissed Johnson's claims against Albin.

### 4.    Findings of fact and conclusions of law

The superior court issued its findings of fact and conclusions of law in March 2022.  It determined that, regardless of whether the subcontract governed the extra work, the parties agreed Johnson was to be compensated on a time and materials basis.  That agreement, the court concluded, required Johnson to document the extra work performed and materials used.  The court found that Johnson largely failed to provide contemporaneous documentation of the materials used and that "[t]he parties engaged in skeletal, and at times inconsistent, communications that left the terms of the agreement uncertain."  It therefore concluded that PAC was required to pay Johnson only for the costs of material and some services that Johnson could prove PAC agreed to pay and for which Johnson could reasonably show the costs incurred.  Where actual costs were not available, the court used the jury verdict method to determine Johnson's damages.

The court found that PAC owed Johnson $191,443.42: $33,000 for the demobilization of two cranes; $11,280 for helicopter use; $17,605 for a man lift rental; $30,000 for boat use; $99,000 for overwintering equipment in 2011-12 and 2012-13; and $513.42 for pile tips for the permanent abutments.[10]  The court next turned to its

---

[9]    Under Civil Rule 41(b), a defendant in a bench trial may move for dismissal "on the ground that upon the facts and the law the plaintiff has shown no right to relief" after the plaintiff's evidence has been presented.

[10]    There was a minor calculation error in the order.  Based on the court's findings, the total award should have been $191,398.42.

contingent findings for the precluded claims. Based on Johnson's 2012 labor records and Morris Johnson's testimony that the snowmachines he used would rent for $250 per day, the court found that PAC would have owed Johnson $15,000 for use of the snowmachines if the snowmachine claim had not been precluded. The court also found that the contingent value of Morris Johnson's labor was $128,700.

PAC filed a motion for reconsideration, which the court granted in part. The court acknowledged that it "sidestepped" the issue of whether the subcontract governed the extra work, and, at PAC's insistence, "clarifie[d] what it left opaque," finding that the extra work was not covered by the subcontract. The court found that the "parties engaged in an ad hoc relationship that deviated from the strict requirements of the subcontract when it was convenient for them to do so." It stated that it would not allow PAC "to weaponize apparent tolerance" for Johnson's noncompliance by "transforming a longstanding course of conduct into a last-minute trap that would enable it to avoid payment" for the extra work.

After reconsideration the court reduced the award for crane mobilization and demobilization from $33,000 to $8,250. It explained that Johnson agreed that PAC had already paid for the first crane's demobilization and part of the second crane's mobilization under Work Order No. 2. It also reduced the $30,000 award for the boat use, concluding that PAC should reimburse Johnson for the diminished value of the used boat instead of its full cost when new. The court set that value at $10,000. Based on those reductions, the court reduced Johnson's total award from $191,443.42 to $146,693.42.

The court also granted PAC's motion to be declared the prevailing party under Rule 68. It determined that prejudgment interest began to accrue on June 7, 2017, the day Johnson sent its first specific demand for payment. It therefore found that Johnson failed to beat PAC's $243,000 offer of judgment, and concluded that PAC was entitled to attorney's fees of $90,993.79. Albin separately moved for attorney's fees as provided by Rule 82; the court granted its request for $77,141.66.

Johnson appeals the order precluding it from pursuing certain damages claims, several damages awards, and the prevailing party determination related attorney's fees. PAC cross-appeals the denial of summary judgment, several damages awards, and Johnson's overall recovery.

## III. STANDARD OF REVIEW

We review the superior court's discovery decisions for abuse of discretion.[11] An abuse of discretion exists when the court's decision is manifestly unreasonable.[12] We review questions of law, including the interpretation of court rules, de novo.[13] In doing so, "we adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[14]

We also review contract interpretation de novo.[15] "Where the superior court considers extrinsic evidence in interpreting contract terms, however, we will review the superior court's factual determinations for clear error and inferences drawn from that extrinsic evidence for support by substantial evidence."[16]

"We 'review denials of summary judgment motions de novo to determine . . . whether the moving party is entitled to judgment as a matter of law, viewing all facts in the light most favorable to the non-movant.' "[17]

---

[11]   *Punches v. McCarrey Glen Apartments, LLC*, 480 P.3d 612, 619 (Alaska 2021).

[12]   *Id.*

[13]   *See Shea v. State, Dep't of Admin., Div. of Ret. & Benefits*, 204 P.3d 1023, 1026 (Alaska 2009).

[14]   *Id.*

[15]   *Nautilus Marine Enters., Inc. v. Exxon Mobil Corp.*, 305 P.3d 309, 315 (Alaska 2013).

[16]   *Id.* (quoting *Villars v. Villars*, 277 P.3d 763, 768 (Alaska 2012)).

[17]   *Baker v. Duffus*, 542 P.3d 1153, 1155 (Alaska 2024) (alteration in original) (quoting *State, Dep't of Health & Soc. Servs., Div. of Fam. & Youth Servs. v. Sandsness*, 72 P.3d 299, 301 (Alaska 2003)).

"A trial court's determination of damages is a finding of fact" which we review for clear error.[18] We apply our independent judgment, however, when deciding whether a damages award was "based on an erroneous application of law."[19] And while we review the award of attorney's fees for abuse of discretion,[20] the issue of "when interest begins to accrue is a question of law, subject to [our] independent judgment."[21]

## IV. DISCUSSION

Johnson raises a number of arguments. It challenges the court's decision to preclude it from pursuing certain damages claims, the amount of several damages awards, and the prevailing party determination and attorney's fee award.

PAC cross-appeals raising several different issues. It argues that the superior court erred by allowing any recovery because the subcontract governed the extra work and Johnson did not comply with certain conditions precedent in the subcontract. PAC also challenges the superior court's denial of summary judgment on the total cost claim, its use of the jury verdict method to measure damages, and several damages awards.

We largely affirm the superior court's decisions. But because it was an abuse of discretion to prohibit Johnson from pursuing the claims for snowmachine use and Morris Johnson's labor without first considering lesser sanctions, we reverse the order precluding claims for those damages. We also reverse the awards for Morris Johnson's labor and boat use and remand for the superior court's reconsideration. As a result, we vacate and remand the prevailing party determination and attorney's fees award.

---

[18] *Galipeau v. Bixby*, 476 P.3d 1129, 1134 (Alaska 2020) (quoting *Haines v. Comfort Keepers, Inc.*, 393 P.3d 422, 427 (Alaska 2017)).

[19] *Id.* (quoting *Haines*, 393 P.3d at 427).

[20] *Lee v. Konrad*, 337 P.3d 510, 518 (Alaska 2014).

[21] *Hofmann v. von Wirth*, 907 P.2d 454, 455 (Alaska 1995).

### A.     Johnson's Precluded Damages Claims

The superior court partially granted PAC's pretrial motion to preclude Johnson from pursuing certain claims due to discovery violations.  It concluded that Johnson violated Civil Rule 26 because it had not provided sufficient documentation in pretrial discovery for several damages claims, including snowmachine use and Morris Johnson's labor.  The court then prohibited Johnson from pursuing these claims for damages, although it permitted the subcontractor to present evidence to support its contingent findings on them.  Johnson appeals, arguing that it complied with Rule 26's requirements.

Rule 26(a) requires parties to make initial disclosures of "all categories of damages claimed" and "the documents or other evidentiary material . . . on which such claims are based."[22]  The rule does not specify a required level of documentation; it simply obliges a party to disclose the documents, if any, on which a damages claim is based.  If a party has not relied on documents to support its claims, the party need not disclose any.[23]  We recently stated that "[p]laintiffs in a contract suit are not required to present documentary evidence to substantiate their damages."[24]  It therefore was legal error to prevent Johnson from pursuing claims for the snowmachine use and Morris Johnson's labor because of Johnson's skeletal discovery documentation.

PAC argues that we should affirm the superior court's preclusion of Johnson's claims because Johnson also failed to provide "a computation of each category of special damages" as required by Rule 26(a)(1)(G).  According to PAC, a "computation" is something more than a "lump sum" and "contemplates some analysis" showing how Johnson calculated the claimed amount.  Johnson, on the other hand,

---

[22]     Alaska R. Civ. P. 26(a)(1)(G).

[23]     *See Griffith v. Hemphill*, 521 P.3d 584, 590-91 (Alaska 2022) (affirming damages award based solely on plaintiff's testimony).

[24]     *Id.* at 590.

contends that it satisfied the rule and addressed PAC's computation concerns in its supplemental disclosures.

Even assuming that Johnson violated its discovery obligation under Rule 26(a)(1)(G) by failing to disclose the computation of its damages, it was an abuse of discretion to impose claim-ending sanctions without first considering less severe sanctions. The court has discretion to impose sanctions on a party that fails to make the required pretrial disclosures "without substantial justification."[25] In most cases, excluding the undisclosed evidence appropriately remedies the violation.[26] But in some circumstances, the court may impose more severe sanctions, like dismissing a part of the action or refusing to allow the offending party to support designated claims.[27]

We have cautioned that claim- or litigation-ending sanctions are appropriate only in "extreme cases."[28] Before imposing such sanctions, the court must consider whether less severe alternatives would adequately protect the opposing party and deter other discovery violations.[29] And the court may not issue an order that has the effect of dismissing a claim unless it finds that the party acted willfully.[30] We have specifically held that preclusion for failing to make pretrial disclosures "should be imposed only as a last resort if a continuance or other sanction is inadequate."[31]

There is no indication in the record that the superior court considered whether a lesser sanction would adequately remedy any prejudice caused by Johnson's

---

[25]     Alaska R. Civ. P. 37(c)(1).

[26]     *See id.* (making exclusion default remedy).

[27]     *See id.*

[28]     *Khalsa v. Chose*, 261 P.3d 367, 372 (Alaska 2011) (quoting *DeNardo v. ABC Inc. RVs Motorhomes*, 51 P.3d 919, 922 (Alaska 2002)).

[29]     *Id.* at 372-73; *accord* Alaska R. Civ. P. 37(b)(3)(D).

[30]     Alaska R. Civ. P. 37(b)(3).

[31]     *Urban v. Urban*, 314 P.3d 513, 517 (Alaska 2013).

late disclosures.  Nor is it clear that less severe sanctions such as excluding the undisclosed evidence would have been inadequate to cure any prejudice.  When it decided to preclude Johnson's claims, the court was concerned there was not enough time "a week before trial" to make up for the lack of disclosure to PAC.  But by the time the court issued its order on March 11, the March 1 trial date had already been rescheduled to June.  Sufficient time therefore apparently remained to cure any prejudice.[32]  It was an abuse of discretion to preclude the claims without exploring lesser sanctions.

## B.    PAC's Argument That The Subcontract Governs

PAC appeals the superior court's finding that Johnson's extra work was not governed by the subcontract.  It argues that the court conflated waiver of select contractual provisions with total abandonment of the contract.  It contends that the terms of the agreement, the parties' conduct, and industry practice demonstrate that PAC and Johnson intended for the subcontract to govern the extra work even if they did not "strictly follow" certain provisions in the subcontract.  Therefore, PAC argues, Johnson is not entitled to recover damages because Johnson did not satisfy two conditions precedent to payment:  the certified payroll and final payment application requirements.  PAC asserts that its duty to pay never arose because Johnson did not satisfy these conditions, and Johnson is not entitled under the subcontract to payment for the extra work it performed.

PAC's theory depends on its argument that the certified payroll and final payment application provisions are conditions precedent.  Johnson questions that premise.

---

[32]    *See Maines v. Kenworth Alaska, Inc.*, 155 P.3d 318, 325-26 (Alaska 2007) (holding two months before trial was sufficient to cure late discovery disclosure).

A condition precedent is a prerequisite, an event, or an act that must occur or exist before a party's duty to perform under a contract begins.[33] If the condition is not fulfilled, then the corresponding duty or duties do not materialize, and the party charged with satisfying the condition has no right to enforce the contract.[34]

Because conditions precedent are viewed with disfavor, "a condition must be 'expressed in plain, unambiguous language or arise by clear implication' " to be enforceable.[35] The purpose of this requirement, we have explained, is to reduce the risk of forfeiture and honor the parties' agreement.[36] When we interpret a contract, our aim "is to give effect to the reasonable expectations of the parties."[37] To do so, we consider the language of the disputed provision, the language of the contract as a whole, extrinsic evidence, and case law interpreting similar provisions.[38]

PAC posits that the language of the subcontract establishes that the certified payroll and final payment application clauses are conditions precedent. The certified payroll clause provides that, if the Forest Service conditions PAC's payment on receipt of Johnson's certified payrolls, then Johnson "shall promptly furnish [PAC] with such required documentation." It also says that PAC "may withhold payment until such documentation has been furnished." The final payment application provision states that PAC's final payment to Johnson "shall in no event become due" until Johnson submits, "as may be required by [PAC]: (i) an affidavit that all payrolls, bills

---

[33]    *Laybourn v. City of Wasilla*, 362 P.3d 447, 453 (Alaska 2015).

[34]    *See id.* at 457.

[35]    *Id.* at 453 (quoting *Jarvis v. Ensminger*, 134 P.3d 353, 358 (Alaska 2006)).

[36]    *Jarvis*, 134 P.3d at 358; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 227 cmt. b (AM. L. INST. 1981).

[37]    *Laybourn*, 362 P.3d at 453 (quoting *Peterson v. Wirum*, 625 P.2d 866, 872 n.10 (Alaska 1981)).

[38]    *Id.*

for materials and equipment, and all other indebtedness of [Johnson] related to its performance of the Work, have been fully paid or otherwise satisfied, and (ii) complete and final lien waivers."

We are not convinced that these provisions are conditions precedent. While we recognize that a contract does not need any magic words to create a condition precedent,[39] the subcontract here does not include any expressly conditional language.[40] PAC suggests that the clause stating that it "may withhold payment until" the certified payrolls have been provided establishes the condition precedent. But that clause could also be read as affecting the timing of payment or authorizing a discretionary action rather than indicating a mandatory event that must occur before PAC's performance is due. PAC's conduct supports this reading: it paid all five of the invoices Johnson submitted without certified payrolls.[41]

Likewise, it is not clear whether the final payment clause empowered PAC to avoid paying Johnson altogether or merely to delay payment. The clause authorized PAC to withhold payment until Johnson submitted certain documents. Some courts have interpreted similar provisions as affecting only the timing of payment, not the obligation itself.[42] Another has interpreted a similar clause as a promise to provide a

---

[39]     *Jarvis*, 134 P.3d at 359.

[40]     *Cf., e.g.*, *Laybourn*, 362 P.3d at 454 ("subject to"); *Klondike Indus. Corp. v. Gibson*, 741 P.2d 1161, 1165 (Alaska 1987) ("if").

[41]     *See Peterson*, 625 P.2d at 874 (holding contractual provision was not condition precedent because, inter alia, party's conduct showed she did not consider provision necessary for performance).

[42]     *E.g.*, *Koch v. Constr. Tech., Inc.*, 924 S.W.2d 68, 73 (Tenn. 1996); *Thos. J. Dyer Co. v. Bishop Int'l Eng'g Co.*, 303 F.2d 655, 657, 659-61 (6th Cir. 1962); *cf. Jarvis*, 134 P.3d at 359 (considering whether provision was condition precedent or timing mechanism).

lien-release affidavit in exchange for final payment.[43]  Applied here, such interpretations avoid forfeiture and fulfill the primary purpose of the subcontract[44]: PAC receives the bridge free of obligation to Johnson and Johnson receives payment for its work.

When read as a whole, the contract further undermines PAC's argument. The certified payroll and final payment clauses are found in Article Five of the subcontract.  The first paragraph of that Article provides that "all payments to [Johnson] are dependent upon, *as a condition precedent*, and not due until [PAC] receives payment from the [Forest Service] for [Johnson's] work, labor and material" (emphasis added).  It also states that Johnson must submit an invoice with receipts and original waivers of lien "[*a*]*s a condition precedent* to issuance of any payments by [PAC] to [Johnson]" (emphasis added).  These clauses show that PAC knew how to unambiguously create a condition precedent when it so desired.  The conspicuous absence of that language from the final payment application and certified payroll provisions casts doubt on the argument that they were intended as conditions precedent.[45]  For that reason, and "the disfavor with which conditions precedent are viewed by the law,"[46] we conclude that the provisions are not sufficiently unambiguous to be conditions precedent to Johnson's right to payment.

Absent a condition precedent, a nonbreaching party is excused from further performance only when there has been a material breach of the contract.[47]  A

---

[43]     *See Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 109-10 (Tex. 2010).

[44]     *Cf. Prichard v. Clay*, 780 P.2d 359, 362-63 (Alaska 1989) (construing term as condition precedent because it was "principal if not sole object" of agreement).

[45]     *Koch*, 924 S.W.2d at 72-73.

[46]     *Peterson*, 625 P.2d at 874.

[47]     *See* RESTATEMENT (SECOND) OF CONTRACTS § 237 cmt. a (AM. L. INST. 1981).

material breach is "one that will or may result in the other party not receiving substantially what that party bargained for."[48] A breach that is not material is a *partial* breach. A partial breach may give rise to a cause of action, but does not excuse future performance.[49] Though the nonbreaching party may be entitled to damages for the partial breach, it is still bound by the contract and may not abandon performance.[50]

PAC does not argue that Johnson materially breached the contract. Its argument that Johnson should be denied recovery under the subcontract rests entirely on its claim that the certified payroll and final payment application provisions are conditions precedent. Because we concluded that these provisions are not conditions precedent, Johnson's failure to comply with them is not a bar to recovery. Therefore, even assuming the subcontract controlled, the superior court did not err by holding that Johnson was entitled to damages.

### C. Method Of Proving Damages

There are four methods of proving damages in a construction lawsuit: the actual cost method, jury verdict method, total cost method, and modified total cost method.[51] The preferred method is the actual cost method, which, as its name implies, identifies the actual expense incurred from the alleged breach to calculate the total claimed amount.[52] If that method is not feasible, a contractor may use the jury verdict

---

[48] *State, Dep't of Nat. Res. v. Alaskan Crude Corp.*, 441 P.3d 393, 401 (Alaska 2018).

[49] *Alaska Energy Auth. v. Fairmont Ins. Co.*, 845 P.2d 420, 423 n.3 (Alaska 1993) ("For a partial breach the injured party can maintain action at once; but he is not permitted to stop further performance." (quoting ARTHUR L. CORBIN, CONTRACTS, § 946 at 811 (1951))).

[50] 23 WILLISTON ON CONTRACTS § 63:3 (4th ed. 2024); RESTATEMENT (SECOND) OF CONTRACTS § 241 cmt. a (AM. L. INST. 1981).

[51] *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 41 (Alaska 1998).

[52] *Id.*

method to prove damages.[53]  The jury verdict method is a variation on the actual cost method.  Instead of showing the actual costs incurred, the plaintiff "present[s] evidence of the cost of additional work . . . [,] including any actual cost data, accounting records, estimates by law and expert witnesses, and calculations from similar projects."[54]

The total cost and modified total cost methods are disfavored.[55]  The total cost method calculates damages by subtracting the original contract price from the actual costs incurred (including a reasonable amount for profit).[56]  We have observed that this approach is "universally disfavored"[57] because it makes so many assumptions: that the "plaintiff's costs were reasonable, that [the] plaintiff was not responsible for any increases in costs, and that [the] plaintiff's bid was accurately computed."[58]  Due to all of these assumptions, a plaintiff contractor must satisfy a four-part test before being allowed to rely on the total cost method.  The plaintiff must demonstrate that: "(1) the nature of the particular losses make it impossible or highly impracticable to determine them with a reasonable degree of accuracy; (2) the plaintiff's bid or estimate was realistic; (3) its actual costs were reasonable; and (4) it was not responsible for the added expenses."[59]

---

[53]     *N. Pac. Erectors, Inc. v. State, Dep't of Admin.*, 337 P.3d 495, 507 (Alaska 2013).

[54]     *Power Constructors*, 960 P.2d at 41 (second alteration in original) (quoting *Mun. of Anchorage v. Frank Coluccio Constr. Co.*, 826 P.2d 316, 325 (Alaska 1992)).  A judge may use the jury verdict method in a bench trial, even though there is no jury.  *See Delco Elecs. Corp. v. United States*, 17 Cl. Ct. 302, 323 (Cl. Ct. 1989).

[55]     *Power Constructors*, 960 P.2d at 41.

[56]     *Geolar, Inc. v. Gilbert/Commonwealth Inc. of Michigan*, 874 P.2d 937, 944 (Alaska 1994).

[57]     *Frank Coluccio Constr. Co.*, 826 P.2d at 325.

[58]     *Geolar, Inc.*, 874 P.2d at 944 (cleaned up) (quoting *Fairbanks N. Star Borough v. Kandik Constr., Inc. & Assocs.*, 795 P.2d 793, 798 (Alaska 1990)).

[59]     *Id.* at 945 (quoting *Frank Coluccio Constr. Co.*, 826 P.2d at 325).

PAC repeatedly urged the superior court to grant its motion for summary judgment because Johnson did not meet this threshold test.  The court agreed that Johnson had not satisfied the test but denied summary judgment because "[t]here are other ways to prove damages."  Before the trial began, the court granted PAC and Albin's motion to prohibit Johnson from using the total cost method to prove damages.  The court ultimately relied on the jury verdict method to calculate some of Johnson's damages.

On appeal, PAC repeats the arguments it made to the superior court.  It maintains that the court erred by denying summary judgment because Johnson made a total cost claim and failed to meet the requirements to rely on that method to calculate its damages.  It also claims that the subcontract required Johnson to prove damages with the actual cost method and that Johnson cannot use the jury method because its own failure to keep specific records is the reason it cannot show its actual costs.

### 1.    Total cost claim

We generally do not review a denial of summary judgment after trial.[60] But because this denial was based purely on a legal issue rather than the presence of factual disputes that a trial could resolve, we will consider it on appeal.[61]

PAC argues that the superior court erred by denying summary judgment because Johnson made a total cost claim and failed to meet the requirements to assert that method for calculating damages.  PAC's argument assumes that Johnson made a total cost claim.  We disagree with PAC.

Johnson's complaint alleged that PAC and Albin breached their contract for extra work, which they agreed to compensate on a time and materials basis. Consequently, Johnson's claimed damages were based on the time and materials it expended performing the extra work — its actual costs.  Though Johnson's initial

---

[60]    *Baker v. Duffus*, 542 P.3d 1153, 1156 (Alaska 2024).

[61]    *Id.*

demand resembled a total cost claim because it estimated the amount owed by subtracting the amount it was paid under Work Order Nos. 1 and 2 from its overall expenditures, it was not a total cost claim. The central feature of a total cost claim "is a comparison between the contractor's initial estimates and the actual cost of performing the contract."[62] Here, there were no initial estimates for the extra work because the parties agreed to payment on a time and materials basis. The superior court ably distinguished the costs that PAC agreed to reimburse from those it did not, thus avoiding the causation concerns that attend the total cost method.[63] It did not err by denying summary judgment.

### 2. Jury verdict method

PAC next argues that the court erred by using the jury verdict method to determine Johnson's damages. PAC contends that the subcontract requires the actual cost method to calculate damages. It argues that two provisions in the subcontract — a recordkeeping clause and a changes clause — show that the parties agreed to measure damages under the actual cost method. The recordkeeping clause required Johnson to keep "full and detailed accounts, books and records as are necessary." The changes provision stated that Johnson "shall keep and present, in any form as [PAC] may direct, a correct amount of the net cost of any extra labor and materials" for changes in the work. Because the subcontract required actual costs, PAC continues, Johnson's failure to present an actual cost claim bars it from recovering any damages.

PAC relies on our decision in *North Pacific Erectors, Inc. v. State, Department of Administration* for support.[64] In that case we considered whether a contractor could recover damages under the jury verdict method for a differing site

---

[62] *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 41 (Alaska 1998) (quoting *Geolar, Inc.*, 874 P.2d at 944).

[63] *Id.* at 41-42, 44.

[64] 337 P.3d 495 (Alaska 2013).

conditions claim.[65]  We held that the contractor could not recover under the jury verdict method because the contract required a different method for calculating damages.[66]  The contractor, we said, was "bound by the express provisions of the contract" requiring proof of actual damages.[67]

The contract at issue in *North Pacific* differed significantly from the subcontract here.  That contract expressly provided that the "contractor must prove actual damages" for any claims for additional compensation and that the "[t]otal cost, modified total cost or jury verdict forms of presentation of damage claims are not permissible to show damages."[68]  In the event of a differing site condition, the contractor was required "to keep an accurate and detailed record" of the "actual 'cost of the work' done under the allegedly differing site condition."[69]  The contract further provided that "[f]ailure to keep such a record shall be a bar to any recovery by reason of such alleged differing site conditions."[70]  In contrast, the subcontract here did not identify a particular measure for damages.  And unlike *North Pacific*, recovery is not conditioned on compliance with the recordkeeping requirements.  The subcontract between PAC and Johnson is silent about the method of proving damages.  Therefore, even assuming the subcontract governed, we are not persuaded that the parties agreed that damages must be proven by the actual cost method.

PAC also argues that case law prohibits the use of the jury verdict method in this case.  *North Pacific*, it says, held that a plaintiff cannot use the jury verdict method when contractual recordkeeping provisions were at issue.  Furthermore, it

---

[65]    *Id.* at 506-09.

[66]    *Id.*

[67]    *Id.* at 507.

[68]    *Id.* at 506.

[69]    *Id.*

[70]    *Id.* (alteration in original).

asserts, a plaintiff "is not excused" from using the actual cost method "by its failure to keep records of actual costs."  And because Johnson could have used the actual cost method if it had retained its records, PAC reasons that it was error to calculate its damages under the jury verdict method.

PAC's reading overstates our holding in *North Pacific*.  Our decision in that case rested on the express contractual provisions that (1) required damages claims to be proven by actual costs and (2) prohibited recovery when the contractor failed to keep records of the actual cost of work done under allegedly different conditions.[71]  We held that the contractor was barred from recovery "because it did not substantially comply" with those express damages and records provisions.[72]  Contrary to PAC's argument, we did not hold that a contractor cannot use the jury verdict method when "specific contractual record-keeping requirements were not at issue."

Nor did we say that a plaintiff cannot use the jury verdict method unless it has shown that a more reliable method is unavailable for reasons beyond its control. The only limitation that we have placed on the jury verdict method is that it cannot be used when a more reliable method of computing damages is available.[73]  This requirement reflects our general preference for the actual cost method while recognizing that "a contractor need not prove damages with mathematical precision."[74]  Although *North Pacific* discussed a federal claims court decision that rejected the jury verdict method because the plaintiff failed to show "a justifiable inability to substantiate the

---

[71]    *Id.* at 506-07.

[72]    *Id.* at 509.

[73]    *Id.* at 507.

[74]    *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 722 (Alaska 2003) (quoting *Mun. of Anchorage v. Frank Coluccio Constr. Co.*, 826 P.2d 316, 325 n.12 (Alaska 1992)).

amount of his resultant injury by direct and specific proof," we did not adopt its holding.[75]

PAC's position runs counter to our two-tiered standard for proving uncertain damages. A contractor must prove the fact of damages by reasonable certainty — that is to say, that it suffered a loss as a result of the breach of contract — but the amount of damages requires a lesser quantum of proof.[76] It need only present " 'some data' to enable a trier of fact to 'reasonably estimate' the amount of those damages."[77] Direct evidence of specific costs is typically the most probative and persuasive. But indirect evidence, such as expert witness estimates and costs of similar projects, can also provide a reasonable basis for calculating damages. Where the contractor has already clearly proven injury, restricting indirect evidence because the contractor failed to demonstrate that it was unable to keep better records unduly burdens recovery.[78] We therefore hold that "a contractor's failure to demonstrate that it was

---

[75] *N. Pac. Erectors*, 337 P.3d at 508 (quoting *Joseph Packard's Sons Co. v. United States*, 532 F.2d 739, 742 (Ct. Cl. 1976)).

[76] *Downing v. Shoreside Petrol., Inc.*, 528 P.3d 874, 887 (Alaska 2023); *see also K & K Recycling, Inc.*, 80 P.3d at 722 (applying standard to contractors).

[77] *Downing*, 528 P.3d at 886 (quoting *Sherbahn v. Kerkove*, 987 P.2d 195, 200 (Alaska 1999)).

[78] We do not share the concern that courts using the jury verdict method will adopt and extend "unrealistic assumptions . . . , greatly multiplying an award beyond reason." *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 882 (Fed. Cir. 1991). The court here primarily relied on the actual cost method. It seems to have used the jury verdict method only to determine damages for the boat and snowmachine use, Morris Johnson's labor, and Johnson's equipment. For each of these awards, it carefully considered the evidence presented. It rejected Johnson's estimates as uncorroborated and fashioned an award based on reason and reliable evidence. The modest sum awarded was substantially less than Johnson's claims, demonstrating the court's "ability to sift through the chaff and find the grain." *Power Constructors, Inc. v. Taylor & Hintze*, 960 P.2d 20, 44 (Alaska 1998). Even under the jury verdict method, the plaintiff must present sufficient evidence for a court to fairly and reasonably

unable to keep better records does not necessarily preclude use of the jury verdict method."[79]

### D. Damages Award

Both Johnson and PAC challenge the superior court's damages award. The determination of damages is a finding of fact that we review for clear error.[80] We will affirm the finding unless, "after a thorough review of the record, we come to a definite and firm conviction that a mistake has been made."[81]

#### 1. Morris Johnson's labor

The superior court prevented Johnson from recovering damages for Morris Johnson's labor because it failed to provide sufficient documentation of those damages during discovery. But the court made a contingent finding that, if allowed to pursue the claim at trial, Johnson would have been awarded $128,700 in damages for Morris Johnson's labor. PAC argues that the court erred because Johnson offered no evidence supporting his claimed hourly rate or hours worked. PAC also takes issue with the court's "speculat[ion] about the number of hours" he worked and use of a multiplier with "no basis in evidence."

The record contains sufficient evidence to provide a reasonable basis for computing the cost of Morris Johnson's labor. Morris Johnson estimated that he worked 1,427 hours on the extra work. The only corroborating evidence presented at trial was the set of certified payrolls from the 2011-12 winter. Based on those

---

approximate damages. *District of Columbia v. Org. for Env't Growth, Inc.*, 700 A.2d 185, 204 (D.C. 1997); *New Pueblo Constructors, Inc. v. State*, 696 P.2d 185, 196 (Ariz. 1985) (en banc); *WRB Corp. v. United States*, 183 Ct. Cl. 409, 425 (Ct. Cl. 1968).

[79]    *Rustler Constr., Inc. v. District of Columbia*, 211 A.3d 187, 198 (D.C. 2019).

[80]    *Galipeau v. Bixby*, 476 P.3d 1129, 1134 (Alaska 2020).

[81]    *Burton v. Fountainhead Dev., Inc.*, 393 P.3d 387, 392 (Alaska 2017) (quoting *Laybourn v. City of Wasilla*, 362 P.3d 447, 453 (Alaska 2015)).

documents, the court estimated that Morris Johnson worked 10 hours a day for 20 days constructing the ice bridge in February and March 2012. It stated it had "no doubt" that he worked more than that during the entire project but because he did not keep time records, it would "assume that [over the life of the project] he worked three times th[e] hours" indicated in the payroll. The court calculated Morris Johnson's hourly rate based on the difference between "wet" (a crane rental with an operator) and "dry" (a crane without an operator) rental rates. Morris Johnson testified that his crane's wet rate was $385 and the dry rate was $225, giving the court a reasonable basis to estimate that the value of an experienced crane operator's time is $130 per hour.[82]

And it was not clear error to triple the number of hours Morris Johnson worked. The court's estimate was based on the hours Morris Johnson worked for two months in 2012. But Morris Johnson performed extra work for PAC for at least two years. It was reasonable for the court to estimate that he provided triple that amount of labor over the course of two years.

It was, however, a clear error to conclude that Morris Johnson worked the equivalent of 330 hours in the 2011-12 winter. The court estimated that Morris Johnson worked 10 hours a day for 20 days in the winter of 2011-12. Because two of those hours were at an overtime rate, it concluded that he effectively worked 11 hours per day for 20 days. Multiplying those hours by the number of days amounts to 220 hours at the worksite that winter, not 330. We therefore reverse the award for Morris Johnson's labor and remand for the court to recalculate these damages.

### 2. Snowmachines

Like Morris Johnson's labor, the superior court precluded Johnson from pursuing its claim for damages for the snowmachine use. But it allowed Johnson to

---

[82]    The court based its finding on the difference between the wet and dry rates, which would be $160. In closing, Johnson agreed that $130 per hour — the hourly rate for crane operators — was reasonable for his labor.

present evidence for that claim and made contingent findings on it. The court concluded that PAC would owe Johnson $15,000 for the snowmachines if its order precluding the claim was reversed on appeal.

PAC argues that the court's finding is clearly erroneous because no evidence at trial supported Johnson's calculation of the number of days it used the snowmachines. It objects to the court's making its contingent findings based on Johnson's certified payrolls, which it argues the court itself found to be inaccurate. But the superior court only said that the documents were not "entirely accurate." The inaccuracies were in the hours, payment amounts, and check numbers, not the number of days or employees who worked in the 2011-12 winter. In contrast, the court found that the number of days indicated in the payrolls (3 employees and 20 days) was more credible than Johnson's 2016 estimates (17 days) or Morris Johnson's testimony (36 days). Those documents were enough for the court to reasonably estimate Johnson's damages.[83]

### 3. Cranes

The court ordered PAC to pay Johnson $99,000 for overwintering two cranes at the worksite. The court found that PAC agreed to reimburse Johnson for overwintering the cranes but "never agreed upon a mechanism for that reimbursement." Finding Johnson's proposed monthly rental rates "too speculative," the court used the crane mobilization rates as a "reasonable, albeit rough" means of estimating the value of leaving the cranes on site for two winters. The parties agreed that mobilizing or demobilizing a crane cost $16,500. The court therefore reasoned that remobilizing the crane left in the 2011-12 winter would have cost $33,000. Similarly, demobilizing and remobilizing the two cranes left in the 2012-13 winter would have cost $66,000.

---

[83]     *Cf. Griffith v. Hemphill*, 521 P.3d 584, 590-91 (Alaska 2022) (holding testimony of single witness sufficient to provide reasonable basis to calculate damages).

Both parties take issue with the court's methodology. Johnson contends that it has no "logical nexus" to the length of time the cranes were at the worksite and asks for reimbursement based on a monthly rental rate; PAC says the court's approach has "no basis in the testimony" and argues that Johnson should have been awarded nothing without presenting reliable evidence of crane rental rates.

The court did not err by rejecting Johnson's proposed rental rates. At trial, Morris Johnson agreed that charges for equipment time under a time and materials agreement can vary. He testified the charge could be based on a wet rate, dry rate, monthly rate, or hourly rate. He also agreed that Johnson and PAC never finalized the terms of the agreement for the extra work, including the crane rates. The superior court therefore found the parties did not agree on a mechanism to reimburse Johnson for the overwintered cranes. It did not err by disregarding Johnson's proposed rental rates because Johnson did not establish that PAC agreed to reimbursement on that basis.[84]

But other evidence provided the court with a reasonable basis to compute damages for the cranes based upon the cost of mobilization. The court determined that PAC was responsible for the delays causing Johnson to leave the cranes at the worksite. Neither party disputes this finding. Testimony supports the court's finding that PAC avoided the costs of demobilizing and remobilizing the cranes by requiring them to remain at the worksite both winters. And the parties agreed that the value of each crane mobilization or demobilization was $16,500. The superior court thus had a reasonable basis to estimate that PAC owed Johnson $99,000 for the overwintered cranes.

### 4. Other equipment

The superior court denied recovery for Johnson's other equipment claims, finding its proposed rental rates "too variable" and "untethered to objective

---

[84] *See City of Whittier v. Whittier Fuel & Marine Corp.*, 577 P.2d 216, 224 (Alaska 1978) (holding evidence did not support damages award because plaintiff failed to prove damages were caused by defendant's wrongful conduct).

contemporaneous proof of a times [sic] and materials agreement." Johnson argues the court erred because the evidence presented at trial — Morris Johnson's testimony and expert testimony regarding equipment rental rates — provided a reasonable basis for computing the award.

Johnson correctly asserts that the party seeking damages must provide a reasonable basis for computing the award.[85] But the evidentiary standard for awarding difficult-to-ascertain damages is two-tiered.[86] As previously discussed, the plaintiff must provide a reasonable basis for computing the *amount* of an award.[87] But Johnson must prove the *fact* of damages with reasonable certainty.[88]

Here, the superior court found that Johnson failed to prove the fact of damages for the other equipment. The court found that there was no agreement to reimburse Johnson for each piece of equipment for which Johnson sought reimbursement. The evidence supports this finding. PAC's proposed change order contemplated payment for an excavator, a loader, and a bulldozer. There is no evidence of an agreement that PAC would pay Johnson for any other equipment it used to perform the extra work. And although Morris Johnson testified that he provided the first project supervisor with his rental rates, the second project supervisor testified he never received any rates when he tried to negotiate a change order with Morris Johnson. Morris Johnson also acknowledged that they never finalized a rental agreement and that equipment rates under a time and materials arrangement could vary. Further, Johnson's dramatically changing estimates for the equipment costs — ballooning from around $500,000 for 23 pieces of equipment before litigation to $2.4 million for around 30 pieces in pretrial discovery and nearly $3 million for over 40 pieces at trial, before

---

[85]    *Downing v. Shoreside Petrol, Inc.*, 528 P.3d 874, 887 (Alaska 2023).

[86]    *Id.*

[87]    *Id.*

[88]    *See id.*

falling to about $2.5 million at closing — indicates that these damages are merely speculative.

### 5. Boat use

The superior court initially found that PAC owed Johnson $30,000 for its boat use: $25,000 for the cost of the boat and $5,000 for wear and tear. On PAC's motion to reconsider, the court reduced the award to $10,000. It reasoned that PAC was not responsible for reimbursing Johnson for the purchase price of the boat and wear and tear, but PAC still owed Johnson transportation costs. The court estimated those costs based on the current value of the boat after PAC's use, which it assumed to be $15,000 "admittedly without any real evidence of the amount of the reduction." Because Johnson purchased the boat for $25,000, the court ordered PAC to pay Johnson the $10,000 for the use of the boat.

Both parties appeal this award. PAC challenges it as speculative and says that the court should not have awarded any damages for the boat. Johnson says that the court should have awarded it $61,000 and argues that testimony at trial established that PAC agreed to rent the boat for $1,000 per day and used it over 40 times.

Damages must be supported by evidence.[89] The superior court candidly admitted it had no evidence to support the amount of damages it awarded. We therefore vacate the damages award for the boat use and remand for recalculation.

### E. Prevailing Party Determination And Attorney's Fees

The superior court determined that PAC was the prevailing party under Rule 68(b), finding that Johnson's total award was less than 90% of PAC's offer of judgment. PAC and Albin's $243,000 offer of judgment was "inclusive of prejudgment interest." The court calculated Johnson's prejudgment interest beginning June 7, 2017. It concluded interest began accruing on that date because that was the date when Johnson made its first demand for a specific amount of payment.

---

[89] *See Dihn v. Raines*, 544 P.3d 1156, 1177 (Alaska 2024).

Johnson argues that the court erred when it chose that date.[90] Johnson argues that prejudgment interest should have run from the day the parties entered into the subcontract: August 23, 2011. In the alternative, Johnson says that it should run from at least August 8, 2013 — the last day Johnson recorded hours working on the project. Johnson asserts that this is the date that PAC "unquestionably knew" that the extra work was completed and that they owed Johnson compensation.

We see no error in the court's decision. Ordinarily in contract disputes, "prejudgment interest runs from the date the claim accrues."[91] In *Hofmann v. von Wirth*, we held that interest accrues when a party knows or should know the value of a debt owed to another.[92] In that case we reviewed a superior court's order requiring an ex-husband to reimburse his ex-wife for half of the expenses she incurred maintaining property they formerly shared.[93] The order included prejudgment interest from the date the ex-wife began paying the costs of upkeep, even though she did not demand reimbursement until years later.[94] We reversed, holding that "a demand was necessary for interest to begin to accrue."[95] We were guided by the principle that "a party [that] cannot ascertain the amount of [its] obligation should not be charged interest for a

---

**90** Johnson also says that the superior court erred in finding that PAC's Rule 68 offer was not an invalid joint offer. It offers no legal theory or support for its claim, instead merely making a "cursory statement in the argument portion of the brief." *Casciola v. F.S. Air Serv., Inc.*, 120 P.3d 1059, 1062 (Alaska 2005). Points that are inadequately briefed are considered waived. *Id.*

**91** *K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 724 (Alaska 2003).

**92** 907 P.2d 454, 455-57 (Alaska 1995).

**93** *Id.* at 454-55.

**94** *Id.*

**95** *Id.* at 457.

failure to meet this obligation."[96] The ex-husband could not have been said to have a duty to reimburse his ex-wife when he had no knowledge of the sums she expended.

Johnson had to make a demand for payment to alert PAC of its obligation to pay. The parties agreed that Johnson would be compensated on a time and materials basis for the extra work. Even though PAC assumed that it owed Johnson some outstanding payment, PAC had no way of knowing the precise amount until Johnson sought payment. But Johnson did not submit an invoice. The first time that Johnson gave PAC an account of the time and materials expended on the extra work was June 7, 2017. The superior court therefore did not err by calculating prejudgment interest from June 7, 2017, as that was the date that PAC "ascertain[ed] the amount of [its] obligation."[97]

Johnson argues that no demand is necessary when a debtor is generally aware of its debt, reading *Hofmann* as "expressly predicated on the obligator's lack of knowledge concerning the obligation owed." On the contrary, *Hofmann* makes it clear that the only time a demand is not needed is when the sum owed is liquidated or easily ascertainable.[98] We observed that no other court had issued a decision "where [prejudgment interest] was awarded against a party who had no knowledge of the sums for which she might be liable. When [prejudgment interest] is awarded, it is on amounts that are either liquidated or ascertainable."[99]

PAC could not have been able to ascertain the amount of its debt to Johnson on August 23, 2011 because the parties had not yet agreed to the extra work by that date. PAC could not have owed Johnson payment for work that had not even been contemplated yet. And even though it knew that Johnson had completed the extra

---

[96]     *Id.* at 456.

[97]     *Id.*

[98]     *Id.* at 456-57.

[99]     *Id.* at 456 (footnotes omitted).

work by August 8, 2013, PAC had no way of knowing the amount it owed Johnson for the work compensated on a time and materials basis. Even Johnson's estimates of the amount due changed dramatically over the course of litigation. The superior court did not err by choosing June 7, 2017 as the date on which prejudgment interest began to accrue.

## V. CONCLUSION

We REVERSE the preclusion of Johnson's damages claims for snowmachine use and Morris Johnson's labor. We VACATE the prevailing party determination and resulting attorney's fee award. We REMAND for further proceedings, including reconsideration of damages for Morris Johnson's labor and the boat use, consistent with this opinion. We otherwise AFFIRM the superior court's judgment.